VALIHURA, Justice,
dissenting:
The Court of Chancery generally has broad discretion in fashioning certain equitable remedies.[1] Although this might suggest that this Court should defer to the *170 Chancellor who ordered one of the most extreme remedies possible — a sale of a financially successful corporation over the objections of one or more of its three stockholders — our review of the Court of Chancery’s order requires construction of a statute, namely, 8 Del, C. § 226 (“Section 226”). Embedded in this choice of remedy is the question of whether a court-appointed custodian has the power to force the sale of a stockholder’s stock absent that stockholder’s consent. The interpretation of a statute is a question of law which we review de novo.[2] My analysis of the statutory scheme suggests that the answer is “no.” Accordingly, I respectfully DISSENT.[3]
Given that we are faced with a question as to the permissible limits of the Court of Chancery’s power under Section 226, the flexibility typically afforded the Court of Chancery in fashioning equitable remedies must yield to the more specific principles underlying the relevant statutory provisions and common law interpreting these provisions.[4] The first principle concerns the uncontested fact that, in the DGCL, stock is “personal property” and is generally subject to traditional property law policies favoring free alienation.[5] Generally, *171 where the possibility of defeasance of a stockholder’s stock may occur over the stockholder’s objection, those restraints on free transferability and alienation of stock are expressly set forth in the relevant statute. That fact strongly suggests that Section 226 should not be so broadly read as to allow for a forced sale or other divestiture of a stockholder’s stock by mere implication. The second principle is the longstanding, uncontested common law principle that the involvement of the Court of Chancery and court-appointed custodians in a corporation’s business and affairs should be kept to a minimum.[6] This longstanding common law view is reflected in the fact that the parties here cannot point to a single case in the history of our Section 226 jurisprudence where a court has ordered a custodial sale of a company over a stockholder’s objections. These specific policies should be the analytical focal point in construing Section 226 and the permissible limits of the trial court’s power.[7]
The appellants add a constitutional gloss on appeal that was not raised below, namely, they contend that a forced sale of their stock might well constitute an unconstitutional “taking” of their personal property in violation of the Fifth Amendment to the United States Constitution and of Article I, Section 8 of the Delaware Constitution. They contend that in order to avoid this potential constitutional problem, Section 226 ought to be construed more narrowly in favor of the implementation of less drastic remedies. The “takings” argument presents novel issues of first impression, which I would not reach.
A holistic reading of the DGCL supports the view that divestiture of a stockholder’s stock may occur over the stockholder’s objection in a number of situations — but only when the relevant statute expressly so provides.[8] Examples where a stockholder is forced to give up her shares have one thing in common — the relevant statutory provisions expressly contemplate that situation and provide fair notice that it may occur. Here, Section 226 contains no such express provision or notice of such potential forced divestiture. I know of no situations in the DGCL where a forced sale of stock can occur absent fair notice, and the Majority cites to none. The absence of authority grounded in the statute, the. conceded absence of any similar cases under Section 226, and our common law’s strong preference for the least intrusive remedies in cases involving court-appointed custodians suggest that the Chancellor went too far too fast in ordering the Modified Auction.
*172 I.
The Statutory Scheme Suggests that the Court of Chancery Lacked the Power to Order Stockholders to Sell Their Shares
In its current form, Section 226(a) permits the Court of Chancery to appoint a custodian in the event of stockholder deadlock, director deadlock, or abandonment of the corporation:
The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians and, if the corporation is insolvent, to be receivers, of and for any corporation when:
(1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors; or
(2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation. that the required vote for action by the board of directors cannot be obtained and the. stockholders are unable to terminate this division; or
(3)The corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets.[9]
In the case of shareholder deadlock, as here, “[t]he decision to appoint a custodian ... is committed to the [ejourt’s discretion” and does not require a showing of irreparable injury to the corporation.[10]
Section 226(b) sets forth the authority of the custodian and states that the custodian’s authority is to continue the business of the corporation and not to liquidate its affairs and distribute its assets:
A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets, except when the Court shall otherwise order and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.[11]
In the event of a court-ordered liquidation, the custodian takes custody of the assets of the corporation — not of the stockholder’s stock (which is the stockholder’s personal property).[12] Section 159 of the DGCL *173 provides that “[t]he shares of stock in every corporation shall be deemed personal property and transferable as provided in Article 8 of subtitle I of Title 6.”[13] This Court, in Grimes v. Alteon,[14] stated that “[s]hares of stock are ⅛ species of property right’ that is of ‘foundational importance to our economic system.’ ”[15]
Although the powers of the custodian under Section 226 are defined by reference to Section 291, as this Court has stated, Section 226 powers “are not as unlimited as the powers of a receiver appointed under the general equitable powers of the court, or under the forerunner to the present [Section] 226(a)(1).”[16] Nor does Section 291 grant the receiver power over the personal property -of the stockholders, although a receiver may sell the property of the corporation under certain circumstances.[17]
Review of the relevant statutory scheme suggests that it is unlikely that the General Assembly intended to permit a stockholder’s fundamental personal property rights to be abridged by mere implication. Where the DGCL does so permit restrictions on the stockholder’s free transferability and alienation of her stock, including forced dispositions and transfers of stock ownership, it does so expressly. Examples include Section 251(c) (permitting approval of mergers by a majority of stockholders, such that dissenting stockholders are divested of their stock subject only to appraisal rights under Section 262); Section 273 (authorizing dissolution' of a joint venture owned by two 50% stockholders); and Section 303(a) (involving actions that may be taken in bankruptcy proceedings that are deemed to be unanimous actions of the stockholders).
As to the first of these examples, the DGCL contemplates the conversion of shares when corporations merge.[18] Sec *174 tion 251 of the DGCL governs mergers. Subsections 251(b) and (c) set forth requirements that a merger agreement must satisfy. Section 251(b)(5), for example, provides that a merger agreement shall state:
The manner, if any, of converting the shares of each of the constituent corporations into shares or other securities of the corporation or resulting from the merger or consolidation, or of cancelling some or all of such shares, and, if any shares of any of the constituent corporations are not to remain outstanding, to be converted solely into shares or other securities of the surviving or resulting corporation or to be cancelled, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares and the surrender of any certificates evidencing them, which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation[.]”[19]
Section 251(c) requires that the merger agreement required by subsection (b) be submitted to the stockholders at an annual or special meeting “for the purpose of acting on the agreement.”[20] It also sets forth notice requirements. Because the power to merge is expressly conferred by statute, every stockholder of a Delaware corporation accepts his or her shares with notice of these provisions. Though a stockholder might be able to pursue an appraisal action to ensure he or she has received adequate compensation,[21] he or she cannot prevent the merger from proceeding on the basis of absence of consent.[22] Importantly, it is clear from the express words of the statute that this outcome is a possibility.[23]
Section 273 applies to joint ventures owned in equal parts by two stockholders and expressly allows for dissolution over the objection of one of them.[24] Its purpose is to alleviate a “fundamental deadlock” by “removing the need for obtaining a unani *175 mous vote[.]”[25] Section 273 “contemplates that the Court of Chancery will enforce an agreed-upon disposition of the assets or, absent such agreement, that the court may order compulsory dissolution of the venture.”[26] Thus, Section 273 expressly permits dissolution of a joint venture even if one 50% owner objects. “The legislature enacted Section 273 to provide a speedy method of dissolving a joint venture corporation when its two 50/50 shareholders are in deadlock.” [27] Section 273(a) provides, in relevant part:
If the stockholders of a corporation of this State, having only 2 stockholders each of which own 50% of the stock therein, shall be engaged in the prosecution of a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture and disposing of the assets used in such venture, either stockholder may, unless otherwise provided in the certificate of incorporation of the corporation or in a written agreement be-tioeen the stockholders, file with the Court of Chancery a petition stating that it desires to discontinue such joint venture and to dispose of the assets used in such venture in accordance with a plan to be agreed upon by both stockholders or that, if no such plan shall be agreed upon by both stockholders, the corporation be dissolved....[28]
“Accordingly, the Court may provide relief to a shareholder if (1) the corporation has only two 50% shareholders (2) who are prosecuting a joint venture and (3) who are unable to agree on discontinuing the joint venture.”[29] The Majority’s attempt to bring this case within the ambit of Section 273 ignores the significance of that separate statute — a point acknowledged by the Chancellor, who agreed that Section 273 did not apply.[30]
Section 303(a) provides that corporate actions taken pursuant to orders of the courts in federal bankruptcy proceedings may be taken “without further action by [the corporation’s] directors or stockholders” and that “[s]ueh power and authority may be exercised” by a representative appointed by the court “with like effect as if exercised and taken by unanimous action of the directors and stockholders of the corporation.”[31] These actions may allow the corporation, for example, to:
amend its certificate of incorporation, and make any change in its capital or capital stock, or any other amendment, change, or alteration, or provision, authorized by this chapter; be dissolved, transfer all or part of its assets, merge or consolidate as permitted by this chapter, in which case, however, no stockholder shall have any statutory right of appraisal of such stockholder’s stock *176 ....[32]
In contrast to each of the provisions above, Section 226 contains no language that suggests that a court-ordered custodian has the power to compel a forced disposition of a stockholder’s personal property (stock).
Relatedly, other provisions of the DGCL address restrictions on transfers of stock and also make clear that restrictions must be stated expressly and clearly. For example, restrictions are often utilized in closely held corporations in order to protect the utilization of certain tax treatment. Section 202 sets forth requirements for a valid restriction on the transfers of securities. The restriction must be “noted conspicuously” on the stock certificate, and it may be imposed in the corporation’s certificate of incorporation or bylaws.[33] Also, “[u]nless noted conspicuously” on the stock certificate, such restrictions are “ineffective except against a person with actual knowledge of the restriction.”[34] Notably, the “noted conspicuously” and “actual knowledge” phrases are derived from the Uniform Commercial Code (the “UCC”) as adopted in Delaware (to which Section 159 refers) and “should be interpreted in light of the relevant Code definitions.”[35]
Although Delaware courts generally have been reluctant to invalidate stock restrictions,[36] this approach is “consistent with the general principle that Delaware corporate law is enabling, and does not impose choices on market participants.”[37] “Delaware public policy generally empowers market participants to decide for themselves whether to enter into contracts restricting their right to sell their shares.”[38] But a forced transfer, untethered to any express statutory authorization, and absent notice of such possible defeasance, divestiture, or transfer, is counter to the principles of free alienation. The general view that the DGCL is broadly enabling does not undercut the conclusion that Section 226 ought to be construed narrowly by a court to bar a custodian’s sale of a stockholder’s stock absent consent. Rather, the enabling aspect of the DGCL implies an element of consensual structuring of the corporate contract concerning the relevant participants.[39]
*177 To further illustrate the importance attributed to fair notice in the DGCL, in Grimes, this Court identified as one of “two fundamental policies of Corporation Law” ensuring “certainty in the instruments upon which the corporation’s capital structure is based.”[40] This Court repeated the need for “strict adherence to statutory formality in matters relating to the issuance of capital stock” and noted that “Delaware’s statutory structure implements these policies through a 'clear and easily followed legal roadmap’ of statutory provisions.” [41] There, this Court rejected a claim of validity of an oral promise made to a stockholder by the CEO to sell ten percent of the corporation’s future private stock offering to the stockholder. This Court held that Sections 151, 152, 153, 157, 161, and 166 of the DGCL, when read together, “contemplate board approval and a written instrument evidencing the relevant transactions affecting issuance of stock and the corporation’s capital structure.”[42] In the instant case, although factually distinguishable, the same need for “[cjertainty in investor expectations”[43] suggests a court should not have power to order stockholders to sell their stock to a third party over their objections — without, at least, advance statutory fair notice to stockholders of such a possibility.
This narrower construction of Section 226 is further supported by examining the special provisions for close corporations in Sections 352 and 353, which also embody concepts of notice and consent, as well as a statutory preference for less drastic, interim remedies to address deadlock situations. For example, Sections 352 and 353 expressly provide for provisional directors in deadlock situations. Section 352 empowers the Court of Chancery, in addition to Section 226, to appoint a custodian for a close corporation in two scenarios. The first is where “[pjursuant to § 351 of this title the business and affairs of the corporation are managed by the stockholders and they are so divided that the business of the corporation is suffering or is threatened with irreparable injury and any remedy with respect to such deadlock provided in the . certificate of incorporation or bylaws or in any written agreement of the stockholders has failed[.]”[44] The second occurs where a stockholder has the “right to the dissolution of the corporation under a provision of the certificate of incorporation *178 permitted by § 355 of this title.”[45] Notably, under Section 355, a stockholder of a close corporation does not have a right of dissolution unless that right is provided in the corporation’s charter. Again, the concepts of fair notice and consent are expressly set forth in the statute. Subsections 355(b) and (c) provide:
(b) If the certificate of incorporation as originally filed does not contain a provision authorized by subsection (a) of this section, the certificate may be amended to include such provision if adopted by the affirmative vote of the holders of all the outstanding stock, whether or not entitled to vote, unless the certifícate of incorporation specifically authorizes such an amendment by a vote which shall be not less than 2/3 of all the outstanding stock whether or not entitled to vote.
(c) Each stock certificate in any corporation whose certificate of incorporation authorizes dissolution as pei’mitted by this section shall conspicuously note on the face thereof the existence of the provision. Unless noted conspicuously on the face of the stock certificate, the provision is ineffective.[46]
As an alternative to appointing a custodian, Section 353(a) provides:
[T]he Court of Chancery may appoint a provisional director for a close corporation if the directors are so divided respecting the management of the corporation’s business and affairs that the votes required for action by the board of directors cannot be obtained with the consequence that the business and affairs of the corporation can no longer be conducted to the advantage of the stockholders generally.[47]
Additionally, “Section 352(b) expressly invites the [cjourt to opt for the less intrusive remedy of a provisional director as authorized by Section 353 if the [cjourt concludes that such an alternative order would be in the best interests of the corporation. Accordingly, the [cjourt is authorized — and, by virtue of this provision, mildly encouraged — to consider resort to that more limited remedy even if the petition itself makes no application for such relief.” [48]
Delaware law also provides for both statutory and equitable dissolution of Delaware corporations, either of which may cause the involuntary divestiture of stockholders’ personal property interests. Subchapter X of the DGCL details the procedures for dissolution.[49] Section 275 provides, in relevant part:
(a) If it should be deemed advisable in the judgment of the board of directors of any corporation that it should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice of the adoption of the resolution and of a *179 meeting of stockholders to take action upon the resolution to be mailed to each stockholder entitled to vote thereon as of the record date for determining the stockholders entitled to notice of the meeting.
(b) At the meeting a vote shall be taken upon the proposed dissolution. If a majority of the outstanding stock of the corporation entitled to vote thereon shall vote for the proposed dissolution, a certification of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.
(c) Dissolution of a corporation may also be authorized without action of the directors if all the stockholders entitled to vote thereon shall consent in writing and a certificate of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.[50]
The dissolution process contemplated by Section 275 is voluntary in that dissolution will only occur if a majority of stockholders either vote in favor of the dissolution or consent of all stockholders to the dissolution is obtained in writing. However, much like a merger under the DGCL, a dissenting stockholder may be involuntarily divested of his or her property interest even if he or she votes against the majority.[51] The dissolution statutory scheme contemplates both relinquishment of an interest in personal property and the protective mechanism of a stockholder vote.
At oral argument, there was a suggestion that Ms. Shawe conceded in her Reply Brief that the Court of Chancery had the power to order dissolution or liquidation here and that, a fortiori, the Court could have ordered a sale of the entire company. I did not read Ms. Shawe’s Reply Brief to concede that either dissolution or liquidation would be appropriate here, and, indeed, at oral argument her counsel strongly contended that the references in her Reply Brief were intended to apply *180 only when a company is insolvenfy-ra situation unquestionably not present here. I disagree with that suggestion, in any event, since Section 226(b) explicitly establishes . the overarching requirement that “the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets.” A dissolution under the circumstances here would be inconsistent with that express statutory requirement.[52] No one has seriously argued on appeal that a dissolution, an asset sale, or a liquidation is an option.[53] The Majority acknowledges that “[njeither Elting nor Shawe want an asset sale,” which it says could result in “ruinous consequences!!.]”[54]
Other involuntary divestitures outside the corporate arena support the concept *181 that express statutory authorization is needed for a court-ordered forced sale to occur. For example, “[ejquity courts have historically upheld the right of a tenant in common to seek a partition of personal property.”[55] The partition of real property is contemplated by 25 Del. C. § 721(a), which provides:
When any 2 or more persons hold lands and tenements within this State as joint tenants or tenants in common, or as parceners under the intestate laws of this State, or when any persons hold an interest either in possession or in remainder in lands and tenements within this State, ... any 1 or more of them ... may present a petition to the Court of Chancery .... The petition shall state the facts, describe the lands and tenements so held, and pray partition thereof among the several parties entitled to such lands and tenements according to their several and respective interests.[56]
“Partition means a severance of interests which are concurrent.”[57] “The purpose of a partition proceeding is to eliminate a present concurrent interest in the same property so that each owner may enjoy and possess his or her interest in severalty.”[58] As a general rule, a co-owner’s right to seek partition of jointly owned property is “almost absolute, since the right is an incident of common ownership.”[59] Importantly, this remedy is part of a statutory scheme that expressly contemplates the relinquishment of some or all of co-owners’ property interests, including by a court-ordered sale.[60]
The Court of Chancery’s decisions appointing a custodian and accepting the Custodian’s recommendation with respect to the Modified Auction contain no textual analysis of the relevant statutory scheme. Instead, the Chancellor relied on two cases, which are distinguishable due to the presence of stockholder consent to the sales in both of those cases. In Bentas v. Haseotes,[61] the parties agreed that liquidation was necessary but disagreed on the method that would “maximize stockholder value.”[62] In Fulk v. Washington Service Associates, Inc.,[63] the parties “endorse[d]” *182 and “support[ed]” a custodian’s plan for sale of a corporation pursuant to Section 273, objecting only to certain closing terms.[64]
Moreover, it is no answer, as Ms. Elting suggests, that Section 394 provides that all corporations agree to make all provisions (including Section 226) part of their respective charters.[65] This is a circular argument.[66] The question here is what are the limits, if any, of the court’s power under Section 226? Our statutory scheme should be read harmoniously.[67] Reading the statutory scheme harmoniously compels the conclusion that Section 226 does not permit the Court of Chancery to confer upon a custodian the power to sell a corporation over the objection of its shareholders. Thus, I believe that the Court of Chancery erred by ordering the Modified Auction.
II.
The Common Law Rule of Judicial Restraint Regarding Custodial Powers Suggests a More Limited Remedy
Similarly, the policies of judicial restraint embedded in our common law underlying Section 226 suggest that the Modified Auction Order’s forced sale provision goes too far. Historically, “the common law generally disdained judicial relief of any kind with respect to a solvent but deadlocked corporation.”[68] Though the pre-1967 iteration of Section 226 vested in the Court of Chancery the discretion to appoint receivers of and for deadlocked corporations, the court was hesitant to interfere in the business of deadlocked but solvent companies.[69] This Court has observed that the General Assembly’s intent *183 with respect to the 1967 revisions “was to ease the onerous burden of proof under the prior case law which made the appointment of a receiver for a solvent corporation almost hopeless, despite a potentially permanent shareholder-deadlock.”[70]
But even so, this Court has determined that “[t]he involvement of the Court of Chancery and its custodian in the corporation’s business and affairs should be kept to a minimum and should be exercised only insofar as the goals of fairness and justice, as stated [in Giuricich], require.”[71] Consistent with this sentiment, at least since the 1967 revisions, the parties have pointed to no case in which the Court of Chancery has exercised its power under Section 226 to order that a company be sold over stockholder objection.[72] Although cases exist in which the Court of Chancery has authorized a custodian to sell a deadlocked corporation pursuant to Section 226, such authorization has been granted only upon agreement by stockholders that a sale was appropriate. In particular, the cases on which Ms. Elting relies nearly universally involved situations where the stockholders consented to a sale.[73] For example, in Fulk,[74] a stockholder sought relief under Section 273, and a court-appointed custodian recommended a sale process in which one stockholder would buy the other’s fifty percent share.[75] With the exception of certain details,[76] the parties “endorse[d]” and “support[ed]” the custodian’s plan.[77] Likewise, in Bentas,[78] the Court of Chancery ordered that a corporation be auctioned only after two stockholder factions submit *184 ted competing proposals to liquidate the company. More recently, in EB Trust v. Information Management Services, Inc.,[79] the parties to a Section 226 proceeding “agreed that a sale of 100% of the stock of the [c]ompany is the best means of maximizing value for the benefit of the stockholders[.]”[80] Similarly, in In re Supreme Oil Company,[81] “the parties agreed [in a Section 226 action] that a sale of 100% of the stock of the [c]ompany or the buy-out of [one of two competing stockholder groups], as the case may be, may be the best means of maximizing value for the benefit of the stockholders.”[82]
Stockholder consent has a significant effect on the extent to which a remedy intrudes upon a corporation’s business and affairs. The existence of consent by stockholders to a sale alters the dynamic with respect to the Court of Chancery’s exercise of its discretion in those cases. Almost by definition, if there is consent, there is less “intrusion.”[83]
Cases in which the Court of Chancery has appointed custodians for solvent corporations support a narrowly tailored, incremental approach to the custodian’s power. For example, in Miller v. Miller,[84] the Court of Chancery rejected a fifty-percent stockholder’s attempt to secure appointment of a custodian to divide or liquidate a corporation, reasoning that “[t]he mere existence of an even stockholder split does not, by itself, authorize dissolution of the corporation or the sale of its only asset through the appointment of a custodian under 8 Del. C. § 226, at least without more.”[85] Instead, the custodian’s “powers should be tailored as narrowly as possible because judicially-supervised interference with the ordinary operation of a corporation should be kept to a minimum.”[86] The court appointed a custodian for a two-year term to “break material deadlocks” between the two equal stockholders, “resolve operational deadlocks[,]” and “seek to resolve the impasse over the future of’ the corporation.[87] It explicitly instructed the custodian not to “sell or divide” the corporation’s assets.[88]
The Court of Chancery’s decisions in Bentas[89] illustrate the principle that the court should minimize its intrusion in the business of the corporation — and actually attempt (not merely consider and reject) *185 less intrusive remedies. There, four stockholder-directors, who owned the corporation in equal shares, were divided into two factions. After one faction sought appointment of a custodian, the Court of Chancery initially declined to appoint a custodian, and instead ordered a stockholders’ meeting pursuant to Section 211 to determine whether the stockholders were deadlocked.[90] As a result of the meeting, two family directors were elected, and the remaining two family directors did not receive the requisite votes and became holdover directors.[91] The court thereafter appointed a custodian, reasoning that the circumstances, including the holdover directors’ history of exercising “negative control” over the company by defeating quorum at board meetings,[92] implicated a “concern that [Section] 226(a)(1) is designed to remedy, namely, a stockholder deadlock that would ‘permit control of the corporation to remain indefinitely in the hands of a self-perpetuating board of directors.’ ”[93]
As to the scope of the appointment, the defendants sought authorization for the custodian either to divide the company’s assets into two corporations, “cause the corporation to purchase the plaintiffs’ interest in the [c]ompany[,]” or, “failing either of the above described alternatives, sell the [c]ompany to a third party, structured either as an asset or stock sale.”[94] The plaintiffs advocated a role in which the custodian would “investigate potential solutions to resolve the deadlock among the stockholders; to recommend such solutions to the stockholders; and in the event no proposal is acceptable to . all of the stockholders, to recommend liquidation of the [e]ompany to the [c]ourt.”[95] The court favored the plaintiffs’ approach and concluded that it was “more appropriate to empower the custodian to explore any and all alternatives that might result in a mutually agreed solution to the current shareholder deadlock.”[96]
Three years later, the custodian filed a report “concluding that liquidation was necessary and desirable,, and recommending an auction of the [c]ompany’s assets as a single package or as a series of asset packages.”[97] The parties submitted .competing proposals, with each side arguing that “its proposal for liquidating the [c]om-pany is the best way to maximize stockholder value.”[98] The defendants sought division of the company’s operating assets into two corporations, with one belonging to each of the two factions, but the custodian and the plaintiffs favored an auction.[99] “The [plaintiffs preferred] to sell the entire [cjompany as a means of liquidation, but they also proposed a plan to partition the assets, since they knew the defendants would oppose a sale.”[100] Because the parties did not desire a trial, the court determined that “only an auction [would] provide reliable information” about the value *186 of the company.[101] The Court of Chancery ordered an auction “to resolve the issues posed by the two pending motions” and determine “whether a viable market for the [cjompany (or any of its lines of business) exists, and whether a sale of the entire [cjompany will generate bids that reflect the [cjompany’s intrinsic value.”[102] The court indicated that, should the auction “fail[ ] to attract any bidders ..., the [cjourt is free to decline to approve any sale, and to order a division of the assets according to the defendants’ plan, or some other plan.”[103] Thus, although the court ordered an auction of a solvent corporation in Bentas, it did so by degrees, exhausting less intrusive remedies first. Further, all stockholders agreed that liquidation was necessary and that the Company could not continue in its existing form.
The case law applying Section 226 therefore supports the view that the sale of the Company, absent stockholder consent, is too drastic a measure, and that the trial court should consider implementation of remedies on an incremental basis.[104]
III.
In View of the Above, the Court of Chancery’s Remedy Here Was, at a Minimum, Too Extreme and Was Not Authorized by the Statute
In deciding whether to exercise its discretion to appoint a custodian and, if so, for what purpose, the Court of Chancery believed it had three options.[105] First, it could deny Siting’s request for a custodian altogether “and leave the parties to their own devices.”[106] The court did not find this option viable, however, because it found that TransPerfect’s management was in a state of “complete and utter dysfunction[,J” and “it would be unjust to leave Elting with no recourse except to sell her 50% interest in the Company.”[107] In particular, the court remarked that Elting would have difficulty selling her shares for a “fair price” due to Shawe’s actions.[108]
Second, the court recognized that it could “appoint a custodian to serve as a third director or some form of tie-breaking mechanism in the governance of the Company.” [109] Such an appointment would complete the full board of directors as contemplated by TransPerfect’s bylaws, which provide for three directors.[110] The court believed, however, that doing so “would enmesh an outsider and, by extension, the [cjourt into matters of internal corporate governance for an extensive period of time.”[111] Noting that Shawe and Elting *187 are “relatively young” and could continue in their positions with TransPerfect “for decades[,]” the court felt that it was “not sensible for the [cjourt to exercise essentially perpetual oversight over the internal affairs of the Company.”[112]
Third, the court considered appointing a custodian to sell the company, an alternative that the court recognized was “unusual” but, in its view, not unprecedented.[113] However, as noted above, the cases relied on by the Chancellor in support of his decision were Bentas,[114] in which the court ordered a sale only as a last resort, and Fulk,[115] a Section 273 case in which the parties “had come to agree that the corporation needed to be dissolved.”[116]
The Court of Chancery thus appointed a custodian who had previously served as mediator to the parties.[117] The court directed the custodian to “oversee a judicially ordered sale of the Company.”[118] The accompanying Order demonstrates that any stockholder not purchasing the Company may be required to sell his or her shares.[119] The court also directed the custodian, “[i]n the interim,” to “serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that [the Custodian] deems to be significant to managing the Company’s business and affairs.”[120]
In my view, the Court of Chancery failed to narrowly tailor the scope of the custodian’s authority, which contemplates the possibility that each stockholder be a seller. The court could have appointed a third director, as provided for in the company’s bylaws, similar to the appointments made in Miller and Bentas. Although the Chancellor considered this option and appointed the custodian as an “interim” tiebreaker until the Modified Auction could be completed, he rejected this solution out of concern that the court would be involved in TransPerfect’s affairs for too long.[121] *188 The Chancellor did not consider the possibility of appointing a custodian for a period of time or expanding the Board to include independent directors.[122] If these less drastic remedies failed, the custodian could petition the court for more drastic relief as in Bentas. But absent consent, however, I do not believe a forced sale is a statutorily authorized option.
IV.
In conclusion, my construction of Section 226 takes account of property rights and due process protections because I believe these concepts are embedded in the relevant statutory framework. This is evident in Section 159’s express statement that stock is personal property, and in the other provisions of our statutory framework that provide clear and express notice in situations where defeasance of that property right might occur. That is why, in reading our statutory scheme harmoniously, it is compelling not to imply the power of the Court to issue an order that can result in defeasance of these rights over the objections of the owners. In cases where the stockholders do not object, then there is no such potential infringement and the court would not be so limited in fashioning a remedy that invokes a sale or transfer of their shares. This reading of Section 226 is consistent with the longstanding policy of strictly limiting the powers of court-appointed custodians.
The Majority Opinion now puts stockholders on notice, at least prospectively, that in deadlock situations where a custodian is appointed pursuant to Section 226, a sale to a third party over the objections of stockholders is a potential permissible outcome, even for a thriving business. This “judicially created notice” now accomplishes what is expressly stated in other provisions of the DGCL and other statutes where defeasance of property rights is possible. These stockholders, however, appear to be stuck with this unanticipated outcome.[123]

. The Court of Chancery has broad discretion, for example, in fashioning a remedy for a fiduciary violation, and the propriety of such a remedy is ordinarily reviewed for abuse of discretion. See Berger v. Pubco Corp., 976 A.2d 132, 139 (Del. 2009) (en banc). But, here, there were express findings post-trial that there were no breaches of fiduciary duty. See, e.g., In re Shawe & Elting LLC, 2015 WL 4874733, at *34 (Del. Ch. Aug. 13, 2015) (“In sum, the asserted acts of misconduct committed by Shawe that Elting has identified — although disturbing and contrary to expected norms of behavior — do not establish the very high level of fiduciary misconduct resulting in harm to the Company or its stockholders (in their capacity as stockholders) necessary to *170 impose the remedy of equitable dissolution.”). Instead, the Court of Chancery was fashioning a remedy pursuant to Section 226, where this Court has held that the intrusion into the business of the corporation must be kept to a minimum. See Giuricich v. Emtrol Corp., 449 A.2d 232, 240 (Del. 1982).

. Corvel Corp. v. Homeland Ins. Co. of N.Y., 112 A.3d 863, 868 (Del. 2015); see also N. River Ins. Co. v. Mine Safety Appliances Co., 105 A.3d 369, 380-81 (Del. 2014) ("[W]e do not defer to the trial court on embedded legal conclusions and review them de novo." (citations omitted)), as revised (Nov. 10, 2014).

. Much of the Majority Opinion addresses the Court of Chancery's power to appoint a custodian — a proposition that is not seriously contested by anyone here. Rather, it is tire Modified Auction’s forced sale provisions that are chiefly at issue. As to that main issue, the Majority declines to formally address the key statutory arguments on the grounds of waiver. Instead, they offer several pages of pure dicta on the issue. I believe that the statutory arguments are fairly encompassed within Shawe’s explicit argument below — that the Court of Chancery should not order a sale under Section 226, Clearly, Section 226 and its proper scope have been a central focus all along. Given that fact, I do not see how a statutory analysis credibly can be avoided. See, e.g., N. River, 105 A.3d at 382-83 (rejecting a Rule 8 challenge and allowing additional reasoning to be presented' in support of a "broader issue” that had been raised); Mundy v. Holden, 204 A.2d 83, 87 (Del. 1964) ("[Wjhen the argument is merely an additional reason in support of a proposition urged below, there is no acceptable reason why in the interest of a speedy end to litigation the argument should not be considered.” (citation omitted) (internal quotation marks omitted)).

. See, e.g., STAAR Surgical Co. v. Waggoner, 588 A.2d 1130, 1137 n.2 (Del. 1991) ("Again, we emphasize that our courts must act with caution and restraint when granting equitable relief in derogation of established principles of corporate law.” (citing Ala. By-Prods. Corp. v. Neal, 588 A.2d 255, 258 (Del. 1991))). Even under an "abuse of discretion” standard of review, the trial court’s discretion is not unlimited. See, e.g., 1 Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution 118 (2d ed. 1993) ("With the equitable remedy, the injunction should restore the plaintiff to her entitlement, no more, no less.”).

. See 2 Drexler, Black & Sparks, Delaware Corporation Law and Practice § 22.01 at 22-2 (2015) ("[Cjorporate stock is personal property,” and ”[t]he free alienability of personal property is a valuable attribute of property ownership worthy of protection by the courts.”); 12 Fletcher Cyc. Corps. § 5452 (Sept. 2016) ("The owner of the shares, as in the case of other personal property, has an absolute and inherent right, as an incident of his or her ownership, to sell or transfer the shares at will, except insofar as the right may be restricted by the articles of incorporation, bylaws, an agreement among shareholders, or between shareholders and the corporation.”).

. See, e.g., Giuricich, 449 A.2d at 240.

. We followed this statute-oriented approach, for example, in Berger, where we considered “what remedy [was] appropriate in a ‘short form’ merger under 8 Del. C. § 253, where the corporation's minority stockholders [were] involuntarily cashed out without being furnished [with] the factual information material to an informed shareholder decision whether or not to seek appraisal.” Berger, 976 A.2d at 133. In evaluating four possible alternative remedies, this Court stated that "the optimal alternative would be the remedy that best effectuates the policies underlying the short form merger statute (Section 253), [and] the appraisal statute (Section 262) ..., taking into account considerations of practicality of implementation and fairness to the litigants.” Id. at 140. Likewise, the focus here should be on proper construction of Section 226 in resolving the question of the scope of the Court of Chancery’s power.

. See Grimes v. Alteon Inc., 804 A.2d 256, 260 (Del. 2002) (en banc ) ("One must read in pari materia the relevant provisions of the Corporation Law.” (italics added)).

. 8 Del. C. § 226(a).

. Miller v. Miller, 2009 WL 554920, at *3-4 (Del. Ch. Feb. 10, 2009), as revised (Feb. 17, 2009).

. 8 Del. C. § 226(b) (emphasis added). Section 291, which governs receivers for insolvent corporations, provides:
Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts, claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper. The powers of the receivers shall be such and shall continue so long as the Court shall deem necessary.
Id. § 291.

.In a liquidation under Section'226(b), the corporation's property is sold. The stockholders continue to own shares, but the corporation is no longer a going concern, and its operating assets are replaced with cash. Liquidation is available by court order and when a coiporation has abandoned its business, is insolvent, or needs to wind up its affairs— *173 circumstances unquestionably not present here. Thus, I disagree with the Majority's statement that "in the context of this case, making a distinction between liquidation and sale has no real practical effect." Majority Op. at 166. The Majority further suggests that, after remand, the Court of Chancery could order TPG’s assets liquidated through a sale process and distribute the proceeds to the stockholders. Id. at 166. It further contends that "Shawe concedes as much.” Id. (citing Opening Br. of Philip R. Shawe at 18-19). Shawe’s statements cannot be fairly viewed as a concession that liquidation was an option here. No party during this appeal has even suggested that either a liquidation or a sale of assets is an option.

. 8 Del. C. § 159.

. 804 A.2d 256 (Del. 2002).

. Id. at 262 (internal omission removed) (quoting Kalageorgi v. Victor Kamkin, Inc., 750 A.2d 531, 538 (Del. Ch. 1999)).

. Giuricich, 449 A.2d at 237; see also id. at 240 (holding in that case that the powers of the custodian “shall be sharply limited”). Indeed, the default statutory obligation under Section 226 is to continue the business and not to liquidate its affairs or distribute its assets. The Majority, in focusing on the reference to powers under Section 291, ignores the limitation on that power which immediately follows that reference — which is “but the authority of the custodian is to continue the business ....” 8 Del. C. § 226(b). I address the exceptions to that default statutory rule in footnote 52.

. See 8 Del. C. § 297.

. Id. § 251(c) ("If a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for the adoption of the [merger] agreement, that fact shall be certified on the agreement by the secretary or assistant secretary of the corporation, provided that such certification bn the agreement shall not be required if a certificate of merger or consolidation is filed in lieu of filing the agreement. If the agreement shall be so adopted and certified by each constituent corporation, it shall then be filed and shall become effective, in accordance with § 103 of this title.” (emphasis added)).

. Id. § 251(b)(5). The legislative synopsis of the 2003 amendment to Section 251(b)(5) states:
The amendments to Sections 251, 252, 253, 254, 255, 256, 257, 263 and 264 clarify that shares or other interests of a constituent corporation or other entity to a merger or consolidation may be converted, cancelled or unaffected by the merger.
Del. S.B. 84 syn., 142d Gen. Assem. (2003).

. 8 Del. C. § 251(c).

. See id. § 262.

. Assuming the merger was otherwise beyond reproach.

. The Majority states that, "[mjany Delaware statutes, including those dealing with certain mergers, subject stockholders to giving up their shares over their objection.” Majority Op. at 165. I agree. The point the Majority completely fails to address is that all of these statutes expressly provide fair notice to stockholders that this may occur.

.The Majority acknowledges that this case “does not fall precisely under [Section] 273[,]” presumably because the Company has three stockholders and is not a joint venture. Majority Op. at 165. Being "within a whisker” of Section 273 ignores the core principle that "[t]he legislative body is presumed to have inserted every provision for some useful purpose and construction, and when different terms are used in various parts of a statute it is reasonable to assume that a distinction between the terms was intended.” Giuricich, 449 A.2d at 238 (internal quotation marks omitted) (citation omitted). For the same reason, it is unreasonable to broadly read the "except when the Court shall otherwise order” language in Section 226 as affording the trial court broad discretion to employ Section 273’s remedial provisions. See Majority Op. at 165.

. In re Arthur Treacher’s Fish & Chips, 1980 WL 268070, at *3-4 (Del. Ch. July 1, 1980).

. Edward P. Welch, Robert S. Saunders, & Jennifer C. Voss, Folk on the Delaware General Corporation Law § 273.1, at 10-63 (6th ed. 2016).

. Wah Chang Smelting & Refining Co. of Am. v. Cleveland Tungsten Inc., 1996 WL 487941, at *3 (Del. Ch. Aug 19, 1996) (citations omitted).

. 8 Del. C. § 273(a) (emphasis added).

. Wah Chang, 1996 WL 487941, at *3 (citing In re Coffee Assocs., Inc., 1993 WL 512505 (Del. Ch. Dec. 3, 1993)).

. See In re Shawe & Elting LLC, 2015 WL 4874733, at *2 n.7 ("Elting initially asserted a claim for dissolution in C.A. No. 9700-CB under 8 Del. C. § 273, Ms. Shawe’s legal ownership of one percent of TPG made that statute inapplicable, and Elting appropriately withdrew that claim.'').

. 8 Del. C. § 303(a).

. Id. § 303(b).

. Id. § 202(a)-(b).

. Id. § 202(a). Section 202(c) describes various types of restrictions on transfers of securities which are permissible under that Section.

. Folk, supra note 26, § 202.06 at 6-19 (listing the following UCC provisions: 6 Del, C. § 1-201(10) ("conspicuous”) and 6 Del. C. § 1-202 (definitions of "notice,” "knowledge,” etc.)).

. Capital Grp. Cos., Inc. v. Armour, 2005 WL 678564, at *9 (Del. Ch. Mar. 15, 2005).

. Id. This is clear in a number of different contexts. See, e.g., Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 845 (Del. 1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest.... Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority.” (citations omitted)).

. Agranoff v. Miller, 1999 WL 219650, at *16 (Del. Ch. Apr. 12, 1999) (citing 8 Del. C. § 202), aff'd as modified, 737 A.2d 530, 1999 WL 636634 (Del. July 28, 1999) (TABLE).

. See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co., 883 A.2d 837, 845 (Del. Ch. 2004) (noting that the DGCL is "widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints”); see also Folk, supra note 26, § 202,6, at 6-20 n.58 (observing that "[t]he argument that a restriction may be imposed without the stockholder's consent, based upon a reserved general power to amend the corporation’s certificate, has been rejected” (citing B & H Warehouse, Inc. v. Atlas Van Lines, Inc., 490 F.2d 818, 825-26 (5th Cir. 1974))).

. Grimes, 804 A.2d at 260 (citing Kalageorgi, 750 A.2d at 538-39).

. Id. (quoting Kalageorgi, 750 A.2d at 538).

. Id. at 261. Section 166, for example, "relating to the formalities required of stock subscriptions, provides that subscription agreements are not enforceable against the subscriber unless in writing and signed by the subscriber.” Id.

. Id. at 266.

. 8 Del. C. § 352(a)(1). To invoke management by the stockholders pursuant to Section 351, the corporation must be a close corporation, its certificate of incorporation must "provide that the business of the corporation shall be managed by the stockholders of the corporation rather than by a board of directors!)]” and the existence of the provisión on the certificate must be "noted conspicuously on the face or back of every stock certificate issued by such corporation.” Id. § 351. If these requirements are satisfied, such corporations may avoid calling stockholder meetings to elect directors, all stockholders are by default considered directors, and all stockholders are "subject to all liabilities of directors.” Id. Because TransPerfect is not a close corporation and is managed by a board of directors, Section 351 does not apply and, likewise, neither does the possibility of seeking appointment of a custodian pursuant to Section 352(a)(1). However, the General Assembly’s approach to deadlock in the context of close corporations is relevant, particularly since TransPerfect has only three stockholders,

.Id. § 352(a)(2). Section 355 permits a close corporation to provide in its certificate of incorporation that one or more stockholders, or a percentage of the stockholders, may force the corporation to dissolve. Id. § 355(a). The provision will not be effective unless each of the corporation’s stock certificates "conspicuously note[s]” the existence of the provision. Id. § 355(c). Cf. Fletcher, supra note 5, at § 8035 ("[Statutory provisions for judicial dissolution of corporations are strictly construed.”).

. 8 Del. C. § 355(b)-(c) (emphasis added).

. Id. § 353(a).

. Donald J. Wolfe, Jr. & Michael A. Pitten-ger, Corporate and Commercial Practice in the Delaware Court of Chancery § 8.09[e][l], at 8-221 (Matthew Bender & Co. 2014) (footnote omitted).

. 8 Del. C. §§ 271-85.

. Id. § 275.

. The Court of Chancery’s power to order equitable dissolution also does not support the argument that the court has broad power to order a custodian to sell a corporation over the objections of stockholders in these circumstances. Under the doctrine of equitable dissolution, a court of equity "may order the dissolution of a solvent company and the appointment of a custodian or receiver ‘only upon a showing of gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented.' ” Carlson v. Hallinan, 925 A.2d 506, 543 (Del. Ch. 2006) (quoting Chapman v. Fluorodynamics, Inc., 1970 WL 806, at *4 (Del. Ch. Mar. 20, 1970)). Courts "exercise[] this power to dissolve a solvent corporation with ‘great restraint’ and only upon a 'strong showing.’ ” Id. (citations omitted). Further, “[m]ere dissension among corporate stockholders seldom, if ever, justifies the appointment of a receiver for a solvent corporation.” Id. (quoting Hall v. John S. Isaacs & Sons Farms, Inc., 163 A.2d 288, 293 (Del. Ch. 1960)); see also VTB Bank v. Navitron Projects Corp., 2014 WL 1691250, at *5 (Del. Ch. Apr. 28, 2014) ("Where the company is solvent, a 'strong showing’ is necessary to invoke [the remedy of the equitable appointment of a receiver, which] should 'not be resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights.’ ” (footnotes omitted) (citations omitted)); Theodora Hldg. Corp. v. Henderson, 257 A.2d 398, 406 (Del. Ch. 1969) ("It is plain, we think, that for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show ... a fraudulent disregard of the minority’s rights, or some other fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement.” (citations omitted) (internal quotation marks omitted)). The Court of Chancery expressly found that equitable dissolution was not warranted here because "the record does not show that Shawe engaged in self-dealing or financially enriched himself at the Company’s expense.” In re Shawe & Elting, LLC, 2015 WL 4874733 at *34.

.Moreover, the language in Section 226(b) creating three circumscribed "exceptions” to the general requirement that a custodian "continue the business of the corporation and not .., liquidate its affairs and distribute its assets,” cannot reasonably be read to authorize the forced sale of a solvent corporation to a third party over the objections of its stockholders. The exceptions in Section 226(b) allow for deviation from the general rule that the custodian must continue the business only "when the Court shall otherwise order and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.” 8 Del. C. § 226(b). First, this "exception” language does not provide express notice of a possible defeasance of one's ownership interest in stock — unlike other statutes which explicitly contemplate defeasance, whether voluntary or involuntary, as a possibility. Nor does Section 226's reference to Section 291 provide sufficient notice of such a possible defeasance, since, among other things, Section 291 applies only to insolvent corporations. The Majority avoids this point altogether.
Second, the three exceptions necessarily modify the custodian’s default obligation to continue the business of the corporation and not to liquidate its affairs or distribute its assets. The second and third exceptions simply provide • for limited circumstances in which a custodian’s default obligation does not apply — namely, where a corporation has abandoned its business (as in Section 226(a)(3)) or where a stockholder in a close corporation has the right, pursuant to the close corporation’s certificate of incorporation, to dissolution of the close corporation (as in Section 352(a)(2)).
The first exception ("except when the Court shall otherwise order”) logically should be read in the context of the second and third exceptions — both of which explicitly identify limited circumstances in which a custodian has no obligation to continue the business of the corporation. It is unreasonable, then, to read the first exception as empowering the Court of Chancery to fashion a remedy wholly incongruous with the two other exceptions. Therefore, the first exception, as the second and third, can only reasonably be read to allow only for a similar discontinuation of the business (e.g., liquidation, distribution of assets, or dissolution).
In short, the exceptions in Section 226(b) do not authorize a forced sale of this solvent corporation to a third party over the objections of stockholders. Perhaps that is why the Majority endeavors mightily to equate the proposed forced auction of TransPerfect to one of the scenarios contemplated by the exceptions in Section 226(b) (which contemplate discontinuation of the business) — a liquidation, a dissolution, or a distribution of assets. The problem with that lies in the fact that a sale or auction of a thriving business is a far cry from a liquidation, dissolution, or distribution of assets. The remedy of a sale does not contemplate, as do liquidation, dissolution, and distribution of assets, the winding up of a corporation’s business. Thus, to the limited extent that Section 226(b) empowers a custodian to undertake a liquidation, dissolution, or distribution of assets, that power does not, a fortiori, allow a custodian to auction the corporation over the objections of its stockholders.

. The Majority's statement that I have suggested that "a lesser remedy like asset sales and dissolution” would be more acceptable remedies is perplexing and just plain wrong. Majority Op. at 166. Nowhere do I suggest that they are "lesser remedies” or that stockholders of solvent companies would prefer these remedies.

. Id. at 24.

. JFL, Inc. v. NJE Aircraft Corp., 1988 WL 58274, at *2 (Del. Ch. June 2, 1988); see Carradin v. Carradin, 1980 WL 10015, at *2 (Del. Ch. Jan. 31, 1980) ("A bill seeking partition of personal property is unquestionably within the historical jurisdiction of equity courts[.]”).

. 25 Del. C. § 721(a); see id. § 751 (conferring on the Court of Chancery "general equity powers” to effect partition).

. Peters v. Robinson, 636 A.2d 926, 929 (Del. 1994) ("Such types of contemporaneous co-ownerships are usually either joint tenancies or tenancies in common.”).

. Id. (citations omitted).

. Hamilton v. Hamilton, 597 A.2d 856, 859 (Del. Fam. Ct. 1990) (citing 68 C.J.S. Partition § [30]) (additional citation omitted); see also Chalfant v. Cornett, 1996 WL 162262, at *2-4 (Del. Ch, Mar. 25, 1996) (discussing the limited circumstances in which courts may equitably deny the right to partition). Similarly, Delaware law provides for the equitable division, distribution, and assignment of marital property in proceedings for divorce or annulment. See 13 Del. C. § 1513(a).

. See 25 Del. C. §§ 729, 733; Libeau v. Fox, 892 A.2d 1068, 1071 (Del. 2006) (“If a physical division of the property would be detrimental to the co-owners' interests, the Court of Chancery may order that the property be sold at public auction and the proceeds divided among the co-owners.”).

. 2003 WL 1711856 (Del. Ch. Mar. 31, 2003),

. Id. at *2-3 (describing the parties' competing plans for liquidation).

. 2002 WL 1402273 (Del. Ch. June 21, 2002).

. Id. at *6.

. 8 Del. C. § 394 (“This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation.”). The Majority suggests that when stockholders buy stock in a Delaware corporation, they should understand that the "Court of Chancery has broad authority to address corporate deadlocks” and to “deal sensibly with corporations!?]” Majority Op. at 165. What is sensible, though, is that investors should be able to expect that courts will adhere to the statutory and common law road map respecting capital stock. The words "otherwise order” do not constitute adequate notice that a stockholder could be forced to sell her holdings in a forced auction of a thriving company.

. The circularity of Ms. Elting’s argument is apparent. For example, she contends that "[Ms. Shawe's] interest in the Company has always been subject to all the provisions of the [DGCL], including [S]ection 226, which constitutes an integral part of [the Company’s] charter and authorizes the court-ordered sale at issue.” Answering Br. at 4.

. See Grimes, 804 A.2d at 260, 265 n.35 (citing 2A Norman J. Singer, Sutherland on Statutory Construction § 46:05 -(2000) (“[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole.” (alterations in Grimes))).

. Wolfe & Pittenger, supra note 48, § 8.09[b], at 8-203; see Salnita Corp. v. Walter Hldg. Corp., 168 A. 74, 75 (Del. Ch. 1933) ("A court should never wrest control of a business from the hands of those who have demonstrated their ability to manage it well, unless it be satisfied that no course, short of the violent one, is open as a corrective to great and imminent harm.”).

. See Paulman v. Kritzer Radiant Coils, Inc., 143 A.2d 272, 272-74 (Del. Ch. 1958) ("Plaintiffs emphasize that this deadlock can go on indefinitely, which is true. But such a consequence is necessarily implicit in the arithmetic of stock holdings. In and of itself it is not a sufficient reason to appoint a receiver under the present law.”); see also Hall, 163 A.2d at 293 (“Under some circumstances courts of equity will appoint liquidating receivers for solvent corporations, but the power to do so is always exercised with great restraint and only upon a showing of gross mismanagement, positive misconduct by the corporate officers, breach of trust, or extreme circum *183 stances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented.”).

. Giuricich, 449 A.2d at 238-39 (footnote omitted). This Court has stated that pre-1967 cases applying "general equitable principles” or earlier statutes addressing stockholder deadlock are “neither governing nor persuasive” in applications of the modem version of Section 226. Id. at 236. However, the common law backdrop against which today’s Section 226 evolved is helpful to understanding the scope of custodial power intended by the General Assembly.

. Id. at 240; see Miller, 2009 WL 554920, at *4.

. Also, there appears to be no such court-ordered sales prior to the current version of the statute, Cf. Tansey v. Oil Producing Royalties, Inc., 133 A.2d 141, 146-47 (Del. Ch. 1957) (ordering appointment of a liquidating receiver for a solvent corporation, without noting whether any stockholders objected, due to the gross mismanagement of the corporation by its majority stockholder, who testified at trial that he intended to dissolve the company anyway).

. One case did not involve a sale, but rather a discovery dispute. In Brown v. Rosenberg, 1981 WL 7638 (Del. Ch. Dec. 17, 1981), the Court of Chancery stated that “it is more likely than unlikely that a [c]ourt will end up appointing a receiver to liquidate a corporation where there are but two stockholders, both of whom own 50% of the corporation’s shares, when they are unable to agree on anything.” Brown, 1981 WL 7638, at *5. This language, which has never been cited by another court, appears in dictum at the end of the court’s order resolving a discovery dispute between the parties. Id.

. 2002 WL 1402273 (Del. Ch. June 21, 2002).

. Id. at *5.

. For instance, the stockholders disagreed on whether the seller and the company’s employees could be enjoined from competing with the corporation following the sale. Id. at *6.

. Id.; see also Tr. of Oral Arg. at 3, Fulk v. Wash. Serv. Assocs., Inc., No. 17747 (Del. Ch. June 4, 2001) ("[T]he parties are in agreement that this corporation needs to be dissolved.”).

. See Bentas v. Haseotes (Bentas I), 1999 WL 1022112 (Del. Ch. Nov. 5, 1999); Bentas v. Haseotes (Bentas II), 769 A.2d 70 (Del. Ch. 2000); Bentas v. Haseotes (Bentas III), 2003 WL 1711856 (Del. Ch. Mar. 31, 2003).

. Order Appointing Custodian, EB Trust v. Info. Mgmt. Servs., Inc., No. 9443 (Del. Ch. June 17, 2014) (ORDER).

. Id. at 2.

. 2015 WL 2455952 (Del. Ch. May 22, 2015) (ORDER).

. Id. at *1.

. See Intrusion, Black's Law Dictionary (10th ed. 2014) (defining "intrusion” as "[a] person’s entering without permission”). In Nixon v. Blackwell, 626 A.2d 1366 (Del. 1993), this Court rejected the suggestion that there should be special, judicially-created rules to "protect” minority stockholders of closely-held Delaware corporations. There, we commented that, "[i]t would do violence to normal corporate practice and our corporation law to fashion an ad hoc ruling which would result in a court-imposed stockholder buy-out for which the parties had not contracted.” Nixon, 626 A.2d at 1380. Elting and Shawe could have, but failed to negotiate an exit strategy. A sale of TransPerfect would give each stockholder a pro rata interest in the control premium to which they otherwise would not be entitled.

. 2009 WL 554920.

. Id. at *5 (citing 8 Del. C. § 226).

. Id. at *4.

. Id. at *5.

. Id. at*5n.21.

. See Bentas I, 1999 WL 1022112; Bentas II, 769 A.2d 70; Bentas III, 2003 WL 1711856.

. Bentas I, 1999 WL 1022112, at *1.

. Bentas II, 769 A.2d at 73.

. Id. at 78.

. Id. (quoting Giuricich, 449 A.2d at 239) (alterations omitted).

. Id. at 79.

. Id. at 80. The plaintiffs also questioned whether Section 226 permitted the court to "direct the custodian to employ one or more of [the defendants’ proposed] measures.” Id. at 79. The court did not explicitly agree or disagree with this statement, but observed generally that the plaintiffs "have the better position.” Id. at 80.

. Id. at 80.

. Bentas III, 2003 WL 1711856, at'*2.

. Id.

. Id.

. Id.

. Id. at *4.

. Id.

. Id.

. The Majority suggests that "less-intrusive measures” or “intermediate measures were attempted but failed.” Majority Op. at 155, 160, 166-67. This is perplexing. A mediation and settlement efforts occurred, but no intermediate measures were “attempted and failed.”

. In re Shawe & Elting, LLC, 2015 WL 4874733, at *31.

. Id.

. Id.

. Id.

. Id.

. See By-Laws of TransPerfect Global, Inc. at Art. II, § 2(a), available at B2857-67.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *31. The cases discussed above suggest that the Court of Chancery had involvement in them for extended periods of time.

. Id.

. Id. The Chancellor stated that the Court of Chancery "occasionally has appointed custodians to resolve deadlocks involving profitable corporations and authorized them to conduct a sale of the corporation.” Id. (citing Bentas II, 769 A.2d at 73 n.3; Bentas III, 2003 WL 1711856; Fulk, 2002 WL 1402273, at *2).

. Bentas II, 769 A.2d at 73 n.3; Bentas III, 2003 WL 1711856.

. 2002 WL 1402273.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *31 n.320 (citation omitted). Notably, Section 273 is not applicable here as there are three owners.

. Id. at *32.

. Id.

. See In re TransPerfect Global, Inc., 2016 WL 3949840, at *2 (Del. Ch. July 18, 2016) (ORDER) (stating that the sale "may involve, without limitation, the sale of 100 percent of the Company’s stock to a third party, or the sale of one or more of the stockholders’ shares of stock in the Company to another stockholder and/or a third-party investor who has bid for such shares in conjunction with an existing stockholder”).

. In re Shawe & Elting LLC, 2015 WL 4874733, at *32 (citing Bentas II, 769 A.2d at 79).

. Id. at *31, 32. Mr. Shawe suggests on appeal that the Court of Chancery could have ordered amendment of the Company's bylaws "to expand the board by addition of independent directors” and that those directors could be delegated the responsibility of "electing] successors and filling] vacancies.” Opening Br. of Philip R. Shawe at 22 n.8. He contends that he "proposed additional alternatives before and during litigation.” Id, Mr. Shawe points to correspondence in which his lawyer made proposals on his behalf to counsel for Ms. Elting, including suggestions that Ms. Elt-ing sell her stake in the company to a third party, offers for Mr. Shawe to purchase her *188 shares, and a proposed shareholder agreement. See A3169-80; A3186-93; A3274-78; A3329-65.

. See In re Shawe & Elting LLC, 2015 WL 4874733, at *32; Miller, 2009 WL 554920, at *5.

. Ms. Shawe, for example, suggests that her constitutional arguments were not raised prior to trial because of the unforeseeable nature of the Chancellor’s unprecedented interpretation of Section 226. See Reply Br. of Shirley Shawe at 5.