Igor KALAGEORGI, Plaintiff,

v.

VICTOR KAMKIN, INC., Anatoly Zabavsky, Andrew Zabavsky, Vladimir R. Gonchar, James Beale, Natalie Zabavsky, Kira J. Caiafa and Desanka Zabavsky.

Civil Action No. 17111.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 21, 1999.

Decided: Sept. 9, 1999.

Revised: Sept. 10, 1999.*

* Revised pages 1, 14, 16, 17, 19, 20, 21 & 24.

Michael Hanrahan and Paul Fioravanti, Jr., of Prickett, Jones, Elliott & Kristol, Wilmington, Delaware, for Plaintiff.

Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Delaware, for Defendants.

## OPINION

JACOBS, Vice Chancellor.

The dispute in this action brought under 8 *Del. C.* § 225 is over who constitutes the lawful board of directors and officers of Victor Kamkin, Inc., a Delaware corporation ("VKI" or the "Company"). That question turns on whether the issuance of the VKI stock voted by the defendants at the Company's February 24, 1999 annual stockholders meeting had been validly authorized by the VKI board. If it was, then the slate elected by the defendants at that meeting are the lawful directors of VKI. If, on the other hand, that stock was void because the board authorization to issue those shares was defective (as the plaintiff contends) then the plaintiff is VKI's sole *de jure* shareholder and officer. The Court finds, for the reasons set forth in this Opinion, that the individual defendants' slate elected at the 1999 stockholders meeting constitute VKI's lawful board of directors, and that a judgment so declaring will be entered.

## I. THE FACTS

This matter was tried to the Court on June 24, 1999, and the matter was submitted thereafter on post-trial memoranda. The material facts are essentially undisputed, but where there are disputes, the facts are as found herein.

### A. *The Parties*

VKI was founded by Victor and Elena Kamkin in 1953, and is one of the largest importers of Russian books in the United States. During its entire operating histo-

ry the Company's principal supplier of books has been a Soviet (now Russian) trading company called V/O Mezhdunarodnaya Kniga ("MezhKniga").[1]

From 1953 to 1974, the Company was operated by Victor Kamkin and his wife, Elena. Until his death in 1974, Mr. Kamkin was VKI's President and sole stockholder. Thereafter, Mrs. Kamkin succeeded to both positions, and as of 1990, she owned all of VKI's 49 issued and outstanding common shares. Today, VKI has 100 issued and outstanding common shares with a par value of $10 per share. Thirty nine (39) of those shares are owned by the plaintiff, Igor Kalageorgi ("Kalageorgi"), who is Elena Kamkin's great nephew. The remaining 61 shares are held—and are claimed to be owned—by MezhKniga and members of the Zabavsky family, namely, defendants Anatoly Zabavsky; his son, Andrew Zabavsky; Anatoly's daughter, Natalie Zabavsky; Anatoly's sister, Kira J. Caiafa; and Anatoly's wife, Desanka Zabavsky. The Zabavsky family has been involved in the management of VKI, both as officers and employees, since the 1970s, when they moved from New York City to Washington, D.C. to accept employment with the Company.

The dispute concerns the 61 shares of VKI that in 1991 were issued to, and since then have been held by, MezhKniga and the Zabavskys. The issue is whether the issuance of those shares was validly authorized by VKI's board of directors, as Delaware law requires. To understand how that issue arises, it becomes necessary to focus on events that occurred in 1990 and 1991.

**B. Events Preceding the Issuance of Stock *To MezhKniga and the Zabavskys***

For reasons that are not altogether clear from the record, during the spring of 1990, MezhKniga sought to enter into a "partnership" relationship with VKI that would involve MezhKniga owning VKI common stock.[2] Mrs. Kamkin was agreeable, but she and Anatoly Zabavsky, VKI's other director, contemplated that as part of this new relationship the Zabavskys would become stockholders of VKI as well. In furtherance of that goal, MezhKniga, Mrs. Kamkin, and Anatoly Zabavsky signed a "Memorandum of Intent" on July 16, 1990, which contemplated that (i) the Company would be "reorganized" into a "new" corporation, (ii) Mrs. Kamkin would own 17 of the 49 outstanding shares of VKI, (iii) the Zabavskys would own 22 of those shares, and (iv) MezhKniga would own the remaining 10 shares. Thus, both of VKI's two directors—Ms. Kamkin and Mr. Zabavsky—were in agreement that some of Mrs. Kamkin's stock would be transferred to the Zabavskys and MezhKniga.

In pursuit of that objective, Mrs. Kamkin met with the Company's long-time counsel, Washington, D.C. attorney, Ronald Precup, Esquire ("Precup"), on August 30, 1990. Anatoly Zabavsky also attended. At that meeting the parties discussed the distribution of shares contemplated by the Memorandum of Intention, but the notes of that meeting indicate that other share distribution alternatives were discussed as well.

By September 6, 1990, Mr. Precup, Mrs. Kamkin (who was then 76 years old)[3], and Mr. Zabavsky were also exploring other

---

**1.** "Mezhdunarodnaya Kniga" is the Russian name for "International Books."

**2.** It appears that MezhKniga needed this arrangement to be in a position to request permission from the Soviet government to deal in hard currencies and to pay publishers in dollars rather than rubles. MezhKniga was also VKI's largest creditor, VKI being (the Court is informed) indebted to MezhKniga for millions of dollars. Whether MezhKniga's desire to own VKI stock was related to its creditor status is not clear from the record.

**3.** Mrs. Kamkin, who is now in her mid-eighties, subsequently became disabled and as a result, was unavailable to testify at the trial.

alternatives to the transaction contemplated by the July 16 Memorandum of Intention. On that date, Mr. Precup wrote Mrs. Kamkin a letter, with a copy to Anatoly Zabavsky, suggesting that Mrs. Kamkin not transfer any shares of VKI to MezhKniga in order to avoid potential problems under the Foreign Agents Registration Act. Mr. Precup suggested instead that MezhKniga be issued stock in a separate company, Victor Kamkin Enterprises. Alternatively, Mr. Precup proposed that if MezhKniga was to receive shares in VKI, that it be required to execute an irrevocable proxy in favor of Mrs. Kamkin, as well as a shareholders agreement that would restrict the transferability of VKI's shares.

On September 26, 1990, Mr. Precup again wrote to Mrs. Kamkin, enclosing a letter from Anatoly Zabavsky setting forth the steps required to be taken to grant MezhKniga a 20 percent ownership in Victor Kamkin Enterprises, with the remaining 80 percent to be owned by Mrs. Kamkin and the Zabavsky family.

On November 1, 1990, Mr. Precup again met with Mrs. Kamkin. Mr. Precup's memorandum of that meeting recites that MezhKniga had rejected the proposal for it to own shares in Victor Kamkin Enterprises. MezhKniga insisted instead on owning stock in VKI. The Precup memorandum then goes on to state:

> The company has 100 authorized shares of a single class of which 49, all owned by Elena, are outstanding. The new ownership plan will involve the issuance of all 51 of the remaining shares. After much consideration, no shares will be transferred as gifts, the new shares will be issued by the corporation at par ($10 each), pursuant to a resolution of the directors. There will be a shareholders agreement signed by all shareholders of the corporation providing for a right of first refusal of the corporation to repurchase shares at $10 each on any proposed sale (but permitting transfers by will) giving Elena a proxy on the Mezhkniga shares, making all share trans-

fers, including new issues of any increased number of authorized shares, subject to the terms of the agreement, and requiring 75–80% shareholder approval for sale of the company or its assets.

The memorandum also indicated that Mrs. Kamkin wanted two additional shares issued to herself so that she would own 51 shares (*i.e.*, an absolute majority) of VKI.

On November 30, 1990, Mr. Precup sent Mrs. Kamkin a letter (with a copy to Mr. Zabavsky), with two enclosures that would accomplish the VKI stock transfer that Mrs. Kamkin wished to achieve. The first enclosure was a Unanimous Written Consent that Mrs. Kamkin, as VKI's sole stockholder and a director, and Anatoly Zabavsky as a director, were to sign. The proposed Consent, dated December 3, 1990, was introduced by several preamble ("Whereas") clauses which recited that MezhKniga had offered to buy 20% of VKI's stock, that certain VKI employees had also expressed a desire to own VKI's common stock, that it was in VKI's best interest to provide for the continuity of ownership and management and for the stability of its business operations, and that VKI's board of directors had determined that the fair market value of the Company's stock was $10 per share. There then followed four resolutions which are quoted verbatim:

> RESOLVED, That the president and Vice President be, and they are hereby authorized and directed to enter into a memorandum of understanding with [MezhKniga] with a view to the acquisition of [MezhKniga] of Twenty (20) shares of the Corporation's Common Stock, under terms and conditions to be negotiated for them in consultation with the Corporation's legal counsel; and it is FURTHER RESOLVED, That the officers of the corporation be, and they are hereby, authorized to issue 20 shares of the Common Stock of the corporation to [MezhKniga] in accordance with the aforesaid memorandum of understand-

ing, and, in addition, 31 shares of the Common Stock of the Corporation in consideration of the payment to the Corporation of cash in the amount of $10.00 per share, to those persons heretofore designated by the Directors; and it is FURTHER RESOLVED, That the Corporation shall require as a condition to the issuance of the aforesaid shares that the transferees enter into a Stockholders Agreement with the Corporation governing the subsequent transfer of such shares; and it is

FURTHER RESOLVED, That the officers of the Corporation be, and they are hereby authorized and directed, to purchase new stock certificates reflecting the change of name of the Corporation that occurred in 1983.

IN WITNESS WHEREOF, we have hereunto set our hand on the date and year set opposite our names.

*Stockholder*

_____

Elena Kamkin

_____

Date of Signature

*Directors*

_____

Elena Kamkin

_____

Date of Signature

_____

Anatoly Zabavsky

_____

Date of Signature

The second enclosure accompanying Mr. Precup's November 30th letter was a proposed Memorandum of Agreement between MezhKniga and VKI, which pertinently provided that MezhKniga would purchase 20 shares of VKI at $10 per share, representing 20% of VKI's out-

standing shares. That document also provided that as soon as practicable VKI and MezhKniga would enter into a Stockholders Agreement restricting the sale of VKI shares to outside parties; and that if for reasons of state or any other reason it was no longer in MezhKniga's interest to own stock in VKI, the Company would repurchase MezhKniga's shares at $10 per share.

In his November 30, 1990 letter, Mr. Precup also instructed Mrs. Kamkin and Anatoly Zabavsky to sign the Unanimous Written Consent and return it to him for filing in the corporation's minute book. That document was never signed by Mrs. Kamkin or Mr. Zabavsky, and it was never returned to Mr. Precup for filing in the corporate minute book.[4] Nor was the stockholders agreement ever entered into. The record does not disclose why the written Consent was never signed or why no stockholders agreement was entered into.[5] On behalf of VKI, Mrs. Kamkin and Anatoly Zabavsky did, however, execute the Memorandum of Agreement with MezhKniga on December 10, 1990.

On January 14, 1991, Mr. Precup again wrote to Mrs. Kamkin, with a copy to Anatoly Zabavsky, advising her that the annual meeting of shareholders and directors of VKI would occur the following day. In his letter Mr. Precup stated:

Finally, I enclose the following stock certificates

| Cert. No. | No. of Shares | Owner |
|---|---|---|
| 1 | 39 | Elena Kamkin |
| 2 | 23 | Anatoly Zabavsky and Desanka Zabavsky, as Joint Tenants with Right of Survivorship |
| 3 | 20 | VB/O Mezhdunarodnaya Kniga |
| 4 | 10 | Kira J. Caiafa |
| 5 | 4 | Natalie Zabavsky |
| 6 | 4 | Andrew Zabavsky |

---

**4.** The plaintiff found, among the papers the Zabavskys had boxed up from Elena Kamkin's office, the original of Mr. Precup's November 30, 1990 letter with the original consent unsigned in the envelope in which it had been mailed. The plaintiff also found among those same papers the copy of the letter sent to Anatoly Zabavsky, together with an unsigned copy of the consent.

**5.** As earlier stated, because of her disability, Mrs. Kamkin, who would have been the most significant witness in the case and who would have been able to shed light on this critical issue, was unable to testify at the trial.

Each of the certificates should be signed by you as President and by [Desanka Zabavsky] as Secretary in all the blanks provided. The records reflect that all of the new shares are issued by the company except certificate no. 4 to Kira. The ten shares she receives are transferred from you, reducing your holdings from 49 to 39 shares.

According to the company's records, you have the old form stock certificates no. 7 for 45 shares and no. 8 for 4 shares, which the new certificate no. 1 replaces. If you can locate those certificates, you should return them to me for cancellation. Only the new form of certificate will be recognized from now on. Also, the corporate resolution that authorized the issuance of these shares (included in my letter to you of November 30, 1990) should be signed by you as a stockholder and by you and [Anatoly] as directors, then returned to me for filing in the minute book.

Thereafter, Mrs. Kamkin signed those stock certificates and also had them signed by Desanka Zabavsky as corporate secretary. Mrs. Kamkin then personally delivered the certificates to each of the recipients, and Mr. Precup made entries in the VKI stock ledger to reflect these new shareholders' stock ownership.

## C. Events Following the Issuance *Of the 61 VKI Shares*

It is undisputed that at all times from and after 1991, Mrs. Kamkin, the Zabavskys, and MezhKniga acted in a manner that was consistent with their being duly authorized shareholders of VKI. For example, in 1992, at the first stockholders meeting after the Zabavskys and MezhKniga became shareholders, each of the VKI shareholders executed a waiver of notice which confirmed that they were stockholders of VKI. For the next five years, at each stockholders meeting Mrs. Kamkin and Anatoly Zabavsky confirmed that they were the holders of "a majority of the outstanding stock of [VKI]," when

they elected themselves as the directors of the Company by written consent. Similarly, in each year Mrs. Kamkin had Desanka Zabavsky, as corporate Secretary, execute and duly file tax returns that confirmed that Mrs. Kamkin was no longer the sole stockholder of VKI. During this entire period no one ever questioned the validity of the 61 shares held and voted by MezhKniga and the Zabavskys.

During the latter part of 1997, Igor Kalageorgi (Mrs. Kamkin's nephew and the plaintiff in this action) became increasingly involved in the affairs of VKI. On February 17, 1998, Mrs. Kamkin executed a proxy authorizing plaintiff to vote 39 of her VKI shares. Four months later, on June 29, Mrs. Kamkin sold her 39 shares to the plaintiff.

In connection with the 1998 stockholders meeting, the VKI board of directors was reorganized (apparently at the plaintiff's request) by amending the Company's by-laws to provide that the "number of directors shall be...[5] for the ensuing year..." The five directors elected at that meeting were Mr. Kalageorgi, Anatoly and Andrew Zabavsky, Vladimir Gontchar (MezhKniga's representative), and James Beale, a VKI employee. Voting to elect those directors, as VKI's majority stockholders, were Mr. Kalageorgi, who executed the consent on Mrs. Kamkin's behalf, and Anatoly Zabavsky. That same day, the newly-elected directors signed a written consent electing Mr. Gontchar and various members of the Zabavsky family as VKI's officers.

## D. *The Parties' Dispute*

By the summer of 1998, Mr. Kalageorgi's and Anatoly Zabavsky's relationship had become strained. Dissatisfied with Zabavsky's management, style, Mr. Kalageorgi began making inquiry into the management of the Company, which included a demand to inspect certain of the Company's books and records. On June 10, 1998, in response to one of Mr. Kalageorgi's specific queries, Mr. Precup advised Mr.

Kalageorgi that he was unable to find the written Directors' Consent authorizing the issuance of shares to MezhKniga and the Zabavskys, that he had sent to Mrs. Kamkin in 1990. Mr. Precup also was unable to confirm that any consideration had been paid for the shares issued in 1991. Mr. Precup did confirm, however, that no shareholders agreement had been executed by the VKI shareholders.

Despite having been thus put on notice of a potential legal issue concerning whether MezhKniga's and the Zabavskys' shares had been duly authorized, Mr. Kalageorgi nonetheless proceeded to acquire Mrs. Kamkin's 39 shares of VKI on July 2, 1998.[6] Thereafter, he consulted Delaware counsel, and on the basis of counsel's advice took the position that the shares held by the Zabavskys and MezhKniga had never been duly authorized by the VKI Board and, hence, were invalid and could not be voted.

That position ripened into the present dispute at the VKI stockholders meeting held on February 24, 1999. At that meeting each of the individual defendants voted for a slate of five directors, consisting of Messrs. Kalageorgi, Anatoly Zabavsky, Andrew Zabavsky, Vladimir Gontchar, and James Beale. Mr. Kalageorgi, however, voted only for himself, but he did not act or otherwise purport to remove any of the four remaining directors who had held office since their election at the 1998 stockholders meeting.

Immediately after voting for the board of directors, the stockholder-defendants then adopted a series of resolutions ratifying, *inter alia,* the issuance of the contested shares to the defendants in 1991. Those same parties then convened a directors meeting and adopted similar ratify-ing resolutions. At both meetings Mr. Kalageorgi voted against those resolutions.

Between February 24 and April 7, 1999, the plaintiff and the individual defendants both claimed to be the lawful board of directors of VKI. To bring the dispute to a head, on April 7, 1999 the plaintiff executed a written consent purporting (i) to remove all directors other than himself who had been elected at the February 24, 1999 stockholders meeting and (ii) to amend the bylaws to reduce the size of the board to one (1) director. Then, purporting to act as the sole director of VKI, the plaintiff executed a written consent removing the Zabavskys and Mr. Gontchar as officers and employees of the Company.

The defendants have refused to recognize these April 7, 1999 consent actions taken by Mr. Kalageorgi, contending that they were invalid and without legal force. In response, Mr. Kalageorgi commenced this § 225 proceeding for a judicial declaration that his written consent actions are valid.

## II. THE CONTENTIONS

The dispute in this case concerns whether the VKI stock issued to the defendants in 1991 was validly authorized under Delaware law by the VKI board of directors. That question is claimed to be outcome-determinative, because if the contested shares were not validly authorized (as plaintiff claims), then the defendants lacked sufficient voting power to elect their slate at the February 24, 1999 VKI stockholders meeting, leaving the plaintiff as the Company's only stockholder[7] and *de jure* director and officer. If, on the other hand, the defendants' VKI stock was validly authorized, then the votes cast by

---

**6.** Although plaintiff contends that he did not realize the legal significance of what Mr. Precup. had told him until after he consulted with Delaware counsel, the record shows that the plaintiff did understand the significance of Mr. Precup's disclosure, as evidenced by his e-mail to Mr. Precup on June 17, 1998. See PX 38.

**7.** Because the plaintiff acquired his 39 VKI shares from Mrs. Kamkin, who inherited them from her late husband, the legal validity of those shares is unchallenged.

the defendants at that meeting were sufficient to elect their director slate (which included the plaintiff), and the consent actions taken by the plaintiff on April 7, 1999 were a nullity.

Mr. Kalageorgi's position is simply stated. Both Delaware statutory law and Article Fourth of VKI's Certificate of Incorporation require formal action by the board of directors to validate the issuance of stock to the Zabavskys and MezhKniga. 8 *Del. C.* § 141(b) pertinently provides that "[t]he *vote* of a majority of directors *at a meeting* at which a quorum is present shall be the act of the board of directors." (Emphasis added). 8 Del C § 141(f) provides that actions that could be taken at a, board meeting may be taken without a meeting only if "all members of the board...*consent* thereto *in writing* and the writing or writings are filed with the minutes of proceedings of the board." (Emphasis added.) Article Fourth of VKI's Certificate of Incorporation provides for shares of VKI's common stock to be issued "by the Corporation acting through its Board of Directors without action by the stockholders."

Thus, plaintiff argues, for the defendants' 61 shares to have been validly authorized, the VKI board authorization had to take the form of either a vote at a duly held meeting of directors or a unanimous written consent of directors filed in the minute book of the Company. There is no third alternative, plaintiff contends, so that even if the directors subjectively intended in fact to issue the stock, informal board action will not suffice. Because it is undisputed that the issuance of VKI common stock was not approved at a board meeting or by a unanimous written consent, plaintiff argues that the issuance of the 61 shares to the Zabavskys and to MezhKniga in 1991 was without legal force or effect. Therefore, the votes represented by those shares at the 1999 VKI shareholders meeting were also invalid and as a consequence, the "management" slate of directors was never legally elected.

The defendants advance two arguments in response. The first is that the 61 shares issued to MezhKniga and the Zabavskys in 1991 were validly authorized, despite the absence of a formal board meeting or a unanimous written consent filed with the minutes. The reason, defendants contend, is that the actions of all of the relevant parties from and after 1991 are consistent with the fact—and clearly establish—that the VKI board of directors did authorize the issuance of shares to the Zabavskys and MezhKniga. Second, the defendants argue that in any event, even if the original issuance of that stock was technically defective, the defect was cured when a majority of the board that had been elected at the February 24, 1999 stockholders meeting (*i.e.*, the four "holdover" directors) voted to ratify the original issuance of the stock to the Zabavskys and MezhKniga, at a board of directors meeting held that same day.

These contentions may be reduced to two issues: (1) Was the issuance in 1991 of VKI stock to the Zabavskys and MezhKniga validly authorized? (2) If not, was any defect in authorization cured by director ratification at the February 24, 1999 directors meeting? Those issues are now addressed.

## III. ANALYSIS

### A. Validity of Authorization of *The 1991 Issuance of Stock*

Highly problematic for the Court is the question of whether the shares held by the Zabavskys and MezhKniga were validly authorized when they were issued in 1991. In most instances the imperatives of law and the demands of equity pull in the same direction, but regrettably that is not always and invariably true. This case is one counterexample. On the one hand, our statutory scheme envisions a model for the issuance of corporate securities that is premised upon a certain degree of formality, specifically, formal board authorization to issue stock at a duly called meeting of

directors, or in lieu thereof, by unanimous written consent.[8] Delaware case law is in accord with, and supportive of, that model.[9]

Several policy reasons that justify the need for such formality readily come to mind. Corporate securities are a species of property right that represent not only a firm's fundamental source for raising capital, but also now a publicly traded commodity that is a critical component for creating both institutional and individual wealth that may affect the economic well-being of entire societies. Given the foundational importance of such securities to our economic system, it is critical that the validity of those securities, especially those that are widely traded, not be easily or capriciously called into question. Otherwise, the resulting economic uncertainty to investors and institutions that relied upon the integrity of those securities would be destabilizing. Accordingly, our statutory scheme, elucidated by case law, has developed a clear and easily followed legal roadmap for creating these valuable instruments that represent claims upon an enterprise's capital. Under that model, if that roadmap is followed, the investment community will be assured that the corporate securities created by that process will not be vulnerable to legal attack. If, on the other hand, it is not followed, then the securities will become subject to possible invalidation.

Viewed in this perspective, the formal requirement that board authorization to issue securities take the form of a resolution adopted at a directors meeting or a unanimous written consent, may be seen as having important functional significance. If either of these "roadmap" procedures is followed, then there can be no dispute over whether a corporate security was validly authorized. If it is not followed, then there will be a dispute that, in the absence of a rigid "bright line" rule, will subject the economic interests that have invested in those securities to the risks (some might say "vagaries") of an evidentiary hearing and of the fact-finding process. So inimical is that uncertainty to the predictability upon which our capital supply system depends, that it justifies a "bright line" set of procedures that guarantees validity if followed, and "invalidity" if not. Those would be the policy arguments for invalidating the Zabavskys' and MezhKniga's stock, even if it were found that the defendants did, in fact, intend for the stock to be issued to these persons.

The defendants do not dispute the need for or importance of the requirement of board authorization. Their claim is that the Delaware law in this area has not become so rigid that a failure to follow this precise formalism must or should automatically and invariably result in invalidating the affected securities. The defendants support their position by distinguishing the cases cited by plaintiff, and then by emphasizing that despite the absence of a formal board meeting or unanimous written consent, the overwhelming weight of the evidence in this case permits only one inference—that VKI's directors and the other parties in interest in fact did intend for the Zabavskys and MezhKniga to be stockholders of VKI.

This position also has much to commend it. I agree, of course, that it would have been preferable had the VKI board approved the issuance of the stock at a di-

---

**8.** See *Balin v. Amerimar Realty Co.*, Del. Ch., C.A. No. 12896, mem. op. at 5, 1996 WL 684377, Jacobs, V.C. (Nov. 15, 1996) ("Under the Delaware General Corporation Law, the board of directors must formally authorize any issuance of stock by the corporation.").

**9.** See *Linton v. Everett*, Del. Ch., C.A. No. 15219, mem. op. at 8, 1997 WL 441189, Jacobs, V.C. (July 31, 1997); *Liberis v. Europa Cruises Corp.*, Del. Ch., C.A. No. 13103, mem. op. at 6, 1996 WL 73567, Balick, V.C. (Feb. 8, 1996), *aff'd*, Del.Supr., 702 A.2d 926 (1997); *Box v. Box*, Del. Ch., C.A. No. 14238, mem. op. at 8, 1996 WL 73575, Allen, C. (Feb. 15, 1996); *aff'd*, Del.Supr., 687 A.2d 572 (1996); *Brandner Corporation v. Stelnick*, Del. Ch., C.A. No. 14463, mem. op. at 6, 1996 WL 82461, Jacobs, V.C. (Feb. 22, 1996).

rectors meeting or by signing the written consent sent to them by Mr. Procop. But, as a factual matter, the defendants' pattern of conduct after the stock was issued also convinces me to a certainty that Mrs. Kamkin and Mr. Zabavsky did intend to authorize the issuance of VKI stock to the Zabavskys and MezhKniga. That being the case, it is hardly frivolous for defendants to argue that to invalidate their stock for purely formalistic reasons would defeat not only the board's clear intent but also the purpose of the formal requirements themselves, which is to create indisputable evidence that the board intended to authorize the issuance of the securities. The case may be rare where such intent can be proved in the absence of a written consent or a resolution adopted at a board meeting, but if that case is established, no purpose would be served by disregarding that clear proof. Here, the defendants argue, the trial record does supply such clear proof, and the legal conclusion that flows from it should be judicially validated.

Moreover, the defendants emphasize, to defeat the board's intention would work a manifest injustice. The Zabavskys accepted employment with VKI and remained in its employ for 25 years in reliance upon their expectation that they would own equity in the enterprise; yet if plaintiff's position is upheld, the Zabavskys will have been ousted from their jobs for no valid equitable reason. Indeed, the defendants point out, the only person who would benefit from the invalidation of their shares would be plaintiff Kalageorgi, who bought his stock from Mrs. Kamkin with full knowledge of the technical deficiency in the documentation evidencing the board's authorization, and who then proceeded to take advantage of that deficiency in an effort to leverage his 39 share minority

interest into a position of absolute ownership and control.[10]

In this case the law and the equities have thus come to collide. To rule in favor of the plaintiff would create, in my view, a wholly unjust result. To rule against the plaintiff would create a not insubstantial risk of injecting uncertainty into what has heretofore been thought to be a predictable area of corporate jurisprudence. Fortunately, however, justice can be done in this case without the Court having to decide this issue. For even if it is assumed—without deciding—that the stock issued to the Zabavskys and MezhKniga in 1991 was not validly authorized, the record establishes that any technical defect in authority was cured by the ratifying vote of a majority of the directors in office at the directors meeting held on February 24, 1999. My reasons for so concluding follow.

## B. The Board's 1999 Ratification *Of The 1991 Stock Issuance*

No party disputes the proposition that where board authorization of corporate action that falls within the board's *de jure* authority is defective, the defect in authority can be cured retroactively by board ratification.[11] The undisputed facts of record establish that is what occurred here.

At the 1998 annual meeting of stockholders, five directors were elected. They were: Anatoly Zabavsky, Andrew Zabavsky, Vladimir Gontchar, James Beale, and Igor Kalageorgi. The validity of this election—and of these five directors' *de jure* title to office—cannot be contested, because even if the only validly issued shares were those owned by Mrs. Kamkin, those shares were cast by Mr. Kalageorgi, acting on Mrs. Kamkin's behalf, in favor of that five director slate.

---

10. If, of course, the directors validly bound the Company to a contract to sell stock to MezhKniga and to the Zabavskys, then the board or the Company could be equitably compelled to perform the ministerial act of issuing the promised shares to those parties.

11. *See In Re Wheelabrator Technologies Inc. Shareholders Litigation*, Del. Ch., 663 A.2d 1194, 1202 n. 5 (1995).

Under Delaware law, each director "shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal."[12] It is undisputed that directors Anatoly and Andrew Zabavsky, Gontchar and Beale did not resign, and were not removed, from their offices before the February 24, 1999 stockholders meeting. At that meeting, all five incumbents stood for reelection. The individual defendants and MezhKniga voted their stock for all five incumbents; the plaintiff cast his 39 votes for himself. Assuming again that the only validly issued and outstanding shares were the plaintiff's 39 shares, the legal result was that he was reelected, and the remaining four directors remained in office as "holdover" directors. The reason is that at that meeting, the plaintiff did not purport either to remove those four directors or to designate their successors.[13] Not until April 7, 1999 did plaintiff execute a written consent attempting to take those actions. But, by that point plaintiff's written consent was without legal force or effect, because the four holdover directors had already voted, at a directors meeting held on February 24, 1999, to ratify the original issuance of the VKI stock to the Zabavskys and MezhKniga in 1991.

\* \* \* \* \* \*

It follows that any defect in the original authorization in 1991 for the issuance of the VKI stock to those parties was cured by the ratifying vote of a majority of the directors in office on February 24, 1999. As a consequence, the lawful directors of VKI are Anatoly Zabavsky, Andrew Zabavsky, Vladimir Gontchar, James Beale, and Igor Kalageorgi; and the lawful officers are those persons elected by those VKI directors (other than Mr. Kalageorgi) at the February 24, 1999 directors meeting.[14]

Counsel for the parties shall confer and submit a form of order implementing the determinations made herein.

---

12. 8 *Del. C.* § 141(b).

13. Since the plaintiff took no steps to remove the four holdover directors, he cannot argue that their director positions became vacant. Under 8 *Del. C.* § 142(e), a "vacancy" is caused by "death, resignation, removal, or otherwise." As of February 24, 1999, there was no death, resignation, or removal, and the plaintiff makes no argument that a vacancy in the four holdover positions "otherwise" occurred.

14. Thus (and perhaps ironically) the formalistic rules set forth in 8 *Del. C.* §§ 141(b) and 142(e) work to serve the ends of equity by depriving a litigant whose claim to control itself rests solely upon a formalism, from benefiting from a self-interested effort to leverage an inadvertence into an unfair advantage over long-term VKI stockholders and employees.