# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ROY MITCHELL EDMONDSON,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL OAKES, ANDREW SMITH, JACQUELINE COMERFORD, REMKO DE JONG, TELIPORTER HOLDINGS LTD., TELIPORTER OVERLAY INC.,<br><br>Defendants,<br><br>TELIPORTER (US) INC. (n/k/a FANBOX EXPERIENCE INC.),<br><br>Nominal Defendant. | C.A. No. 2025-1468-LWW |

## MEMORANDUM OPINION

Date Submitted: February 23, 2026
Date Decided: February 27, 2026

Roy Mitchell Edmondson, Grand Prairie, Texas; *Plaintiff, Pro Se*

Elizabeth Wilburn Joyce, Jason Z. Miller & Megan Ix Brison, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Attorneys for Defendants Daniel Oakes, Andrew Smith, Jacqueline Comerford, Teliporter Holdings, Ltd., Teliporter Overlay Inc., and Teliporter (US) Inc.*

Remko de Jong, New York, New York; *Defendant, Pro Se*

**WILL, Vice Chancellor**

This post-trial decision resolves a control dispute over Teliporter (US) Inc. under 8 *Del. C.* § 225. Plaintiff Roy Mitchell Edmondson requests a declaration confirming his status as the company's sole director by relying on a technicality of his own design.

When Teliporter was formed as the United States subsidiary of a foreign enterprise, Edmondson secretly withheld his signature from the founding consent to thwart a stock issuance to the parent company. Yet, he accepted the parent's funding and the officer titles the consent provided. Months later, seeking leverage in a personal compensation dispute, Edmondson invoked the unsigned consent. He issued a controlling block of shares to himself and his associates, then filed this suit to validate his takeover.

Edmondson insists his actions strictly complied with Delaware law, but statutory compliance does not end the inquiry. Edmondson acquiesced to the parent's ownership and is equitably estopped from denying it. His own entrenching stock issuance fails enhanced scrutiny and is voidable. His claim is also barred by unclean hands. Judgment is entered for the defendants.

## I. BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. The Initial Meeting and Warner Contract

Plaintiff Roy Mitchell Edmondson and defendant Daniel Oakes met in 2022 at the British Grand Prix, while Edmondson was contracting for a retail operation at the track site.[2] Realizing they had mutual interests, Edmondson and Oakes discussed operating a business together.[3]

In June 2022, Oakes formed Teliporter Holdings Ltd. ("Holdings"), a United Kingdom company of which he is the sole stockholder.[4] Holdings "deliver[s] [pop-up] retail spaces for music acts or sporting acts, entertainment acts and brands."[5] It was envisioned as a global operation, with subsidiaries across Europe, the United States, Australia, and the Middle East.[6] Defendant Andrew Smith was appointed

---

[1] *See* Joint Pre-trial Stipulation and Proposed Order (Dkt. 63) ("PTO"). Trial occurred over half a day, during which three fact witnesses testified by Zoom. Trial Tr. of Feb. 20, 2026 (Dkt. 74). Trial testimony is cited as "[Name] Tr. __." The trial record has 185 joint exhibits, including six deposition transcripts. Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* Joint Tr. Ex. List (Dkt. 63). Deposition transcripts are cited as "[Name] Dep."

[2] PTO § II ¶ 3; Oakes Tr. 87.

[3] *See* Oakes Dep. 6, 9-10.

[4] JX 55 at 6, 9-10.

[5] Smith Dep. 20-22; Oakes Tr. 88.

[6] Smith Dep. 20-22; Oakes Tr. 89.

Holdings' Chief Operating Officer, and defendant Jacqueline Comerford was appointed the Finance and Operations Manager.[7]

In the fall of 2024, Warner Music Experience ("WMX") engaged Holdings to operate pop-up retail stores in the United Kingdom and North America for the 2025 reunion tour of the rock band Oasis.[8] Edmondson was to function as a "local operational partner" of Holdings to "find locations, . . . build the team and operate out on the U.S. element."[9] Edmondson hired Sheri Timmons and Shane Terenzi to assist him with these efforts.[10]

## B. The Company's Formation

To implement its business strategy, Holdings hired defendant Remko de Jong to form a United States subsidiary.[11] In March 2025, Comerford instructed de Jong that "[t]he company name would be: Teliporter (US) Inc. [and that it] would be 100% owned by UK Company Teliporter Holdings Limited."[12] On April 16, de Jong filed a certificate of incorporation with the Delaware Secretary of State, establishing Teliporter (US) Inc. (the "Company") and authorizing the issuance of 200 shares of

---

[7] Smith Dep. 20-22; Oakes Tr. 92; Comerford Dep. 25.

[8] PTO § II ¶ 4; *see* JX 5; Oakes Tr. 93, 96.

[9] Smith Dep. 24; *see* Oakes Tr. 98.

[10] Edmondson Dep. 63, 102; Oakes Tr. 95, 99, 101.

[11] Comerford Dep. 28-29; JX 18; de Jong Tr. 59.

[12] JX 33 at 7.

stock.[13]  de Jong, as the incorporator, also signed a written consent appointing Edmondson as the Company's sole director.[14]

On April 22, de Jong emailed Edmondson the incorporation documents.[15]  de Jong included a proposed written consent that would appoint Edmondson the Company's President, Secretary and Treasurer and purported to issue 10 shares of its stock to Holdings (the "April Consent").[16]  The April Consent was set up for Edmondson's signature in his capacity as the Company's sole director.  Edmondson neither objected to nor executed the April Consent.[17]  He kept his refusal to sign the document a secret from the defendants.[18]

## C.  Business As Usual

Over the next six months, the Company executed on the U.S. portion of its WMX contract by setting up an Oasis merchandise store in Los Angeles, California.[19]  Holdings took considerable steps to support the Company.[20]  For

---

[13] JX 27.

[14] PTO § II ¶¶ 1- 2; JX 27; JX 33 at 1.

[15] JX 35 ("April Consent").

[16] *Id.* at 6-8; de Jong Tr. 61-62; Edmondson Tr. 11-12.

[17] PTO § II ¶ 6; April Consent 8; de Jong Tr. 62; Edmondson Tr. 28-33.

[18] Edmondson Tr. 30-33.

[19] Smith Dep. 24-25, 28.

[20] Oakes Tr. 103 ("Well, from a central office function, we helped oversee everything from the insurance to putting in the payment processing, working on recruitment.  We ran the back-office function to make sure that product and all processes were put in place.").

example, Comerford worked to finalize insurance coverage, and established a bank account for the Company at City National Bank (CNB).[21]  Holdings also infused the Company with a $225,000 "[s]etup [l]oan."[22]

Edmondson, Timmons, and Terenzi raised no concerns about Holdings' steering of the Company.  To the contrary, on June 12, Edmondson asked Oakes, Smith, and Comerford for permission to "connect with [a] lawyer to review the lease in the US" and sought an update on insurance procurement.[23]  Comerford responded by including Edmondson in her correspondence with the insurance broker, in which she stated that the Company was a wholly owned subsidiary of Holdings.[24]  He did not correct her.

Reimbursements also generally ran through Holdings, as the Company lacked infrastructure to process them.[25]  Edmondson, Timmons, and Terenzi routinely submitted reimbursements for payment from Holdings.[26]

---

[21] Comerford Dep. 27, 31, 36; JX 17; JX 20; JX 49; Edmondson Tr. 34-35.

[22] PTO § II ¶ 8.

[23] JX 62.

[24] JX 68 at 3, 11 ("Teliporter (US) Inc. is a US company and 100% owned by the UK company.").

[25] *See* JX 107 at 5 (Edmondson telling CNB that "Jackie [Comerford] has to approve on all the invoices I put in").

[26] *See, e.g.*, JX 74 (Timmons invoice); JXs 95-96 (Timmons invoices); JX 57 (Terenzi invoice); JX 73 (Terenzi invoice); JX 78 (showing Edmondson requesting a deposit from Holdings to cover decoration costs); JX 76 (requesting payment from Holdings on items needed for the LA pop-up store).

The Los Angeles store grossed over $2 million in revenue during August and September 2025, around the time Oasis performed in Pasadena.[27]

## D.     The October Consent

On September 9, 2025, at de Jong's request, Edmondson signed a form for the Company to transact business in Illinois.[28] That form, which Edmondson executed in his capacity as a director and under penalty of perjury, reflected that the Company had issued 10 shares of stock to Holdings.[29]

But then Edmondson changed course. On October 7, he purported to issue 50 shares of Company stock to himself, Thomas Tauzin, and Timmons each "for the promise of future services" (the "October Consent").[30] He was motivated by a belief that he had not received equity in Holdings he was owed for his services.[31] By awarding stock to himself and his associates, he hoped to catalyze a "discussion

---

[27] PTO § II ¶ 7; *see Oasis Live '25 World Tour*, Rose Bowl, rosebowlstadium.com/events/details/475/oasis-live-'25-world-tour (last visited Feb. 26, 2026).

[28] JX 105 (Illinois Form BCA 13.15, Appl. for Authority to Transact Business in Illinois); Edmondson Tr. 45-46; de Jong Tr. 64.

[29] JX 105; Edmondson Tr. 46; *see* Edmondson Dep. 142-43.

[30] JX 110; PTO § II ¶ 9; *see also* Tauzin Dep. 11-12 (Tauzin explaining that he is a Washington, D.C.-based consultant).

[31] Edmondson Tr. 51-52; *see* Edmondson Dep. 173.

about ownership" to "safeguard the sweat equity that [he, Timmons, and Terenzi] . . . had put into the organization since it was started."[32]

Edmondson took further steps to consolidate control of the Company. First, on October 8, he executed a unanimous written consent removing Comerford as a signatory on the CNB bank account.[33] Second, on October 9, he executed a certificate for CNB representing that he was the Company's 100% beneficial owner.[34] Third, on October 20, he filed a certificate of amendment with the Delaware Secretary of State purporting to change the Company's name to FanBox Experience Inc.[35] In that filing, he identified himself as the Company's President, Treasurer, Secretary, and sole director.[36] Finally, on October 28, he prepared a certified stock ledger reflecting the October Consent's stock issuance.[37]

### E. The Ownership Dispute

In late October, Comerford discovered that Edmondson had added Tauzin as a signatory to the Company's CNB account without her consent.[38] On November

---

[32] Edmondson Tr. 51-52; *see* Edmondson Dep. 172.

[33] JX 111.

[34] JX 113 at 2-3.

[35] JX 114 (Certificate of Amendment); *see* JXs 115-16.

[36] JXs 114-16.

[37] JX 118.

[38] Edmondson Dep. 126-27; Comerford Dep. 44-45; JXs 122-23.

13, Edmondson revealed—for the first time—that he never executed the April Consent.[39]

On November 19, de Jong—at Holdings' direction—formed defendant Teliporter Overlay, Inc. as a Delaware corporation.[40]  Since Edmondson had effectively seized the Company, Overlay was intended to fulfill Holdings' United States business obligations.[41]  On November 20, Oakes and de Jong executed a stock ledger that purported to reflect an April issuance of 10 shares of Company stock to Holdings.[42]  The same day, de Jong also signed a new statement of incorporator purporting to appoint Oakes and Smith to a reconstituted two-person board of the Company.[43]

## F.    This Litigation

On December 19, 2025, Edmondson, acting pro se, filed this litigation under 8 *Del. C.* § 225, seeking a declaration that Holdings cannot remove him as a director of the Company.[44]  I expedited the case and entered a status quo order to govern the Company's operations during the pendency of this suit.[45]  Due to exigencies with

---

[39] PTO § II ¶ 11.

[40] *Id.* ¶ 12; de Jong Dep. 20; JX 137; *see also* Oakes Tr. 89.

[41] Smith Dep. 19.

[42] JX 135; Oakes Tr. 116.

[43] JXs 136-37.

[44] *See* Dkt. 1.

[45] *See* Dkts. 9, 34.

the Los Angeles store lease and payment purportedly due to WMX, I set the case for an expedited trial.[46]

The defendants filed a pre-trial brief on February 16, and Edmondson filed a pre-trial brief the next day.[47] A half-day trial was held on February 20.[48] Both parties filed post-trial briefing on February 23, and I took the matter under advisement.[49]

## II. LEGAL ANALYSIS

Section 225(a) of the Delaware General Corporation Law (DGCL) provides that "[u]pon application of any stockholder or director . . . the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation."[50] The plaintiff bears the burden of proving his entitlement to relief by a preponderance of the evidence.[51]

---

[46] *See* Dkt. 48.

[47] *See* Pl.'s Pre-trial Brief (Dkt. 68) ("Pl.'s Pre-trial Br."); Defs.' Pre-trial Br. (Dkt. 66) ("Defs.' Pre-trial Br.").

[48] JXs 73-74.

[49] *See* Pl.'s Post-trial Brief (Dkt. 70) ("Pl.'s Post-trial Br."); Defs.' Post-trial Br. (Dkt. 71) ("Defs.' Post-trial Br.").

[50] 8 *Del. C*. § 225(a).

[51] *In re IAC/InterActive Corp*., 948 A.2d 471, 493 (Del. Ch. 2008).

9

Actions under Section 225 are summary in character and "in the nature of an *in rem* proceeding."[52]

Because the proceeding is narrow in scope, the court may only grant relief needed to resolve the dispute over corporate office.[53] It will decline to address matters collateral to deciding the identity of the entity's lawful directors.[54]

Here, there is no dispute that Edmondson has been the Company's sole director since its formation in April 2025.[55] Edmondson initiated this action to obtain a declaration that Holdings lacks the voting power to remove him. To adjudicate whether Edmondson is immune from removal, I must determine who lawfully owns the Company's voting stock.

Section 227(a) of the DGCL grants the court ancillary jurisdiction in a Section 225 matter to "determine the right and power of persons claiming to own stock to vote at any meeting of the stockholders."[56] Holdings has asserted its right

---

[52] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *4 (Del. Ch. Sept. 17, 1997).

[53] *See Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011) ("A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer.").

[54] *See Avgiris Brothers, LLC v. Bouikidis*, 2022 WL 4672075, at *13–14 (Del. Ch. Sept. 30, 2022) (declining to resolve collateral matters in the Section 18-110 context).

[55] PTO § II ¶1.

[56] 8 *Del. C.* § 227(a); *see also CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 390 (Del. 2023) (affirming the Court of Chancery's invalidation of a board's instruction to disregard certain votes in a Section 225 proceeding).

to exercise that voting power,[57] and Edmondson seeks a declaration that it lacks the authority to remove him. The dispute is therefore immediate and concrete, not hypothetical.

Resolving that ownership dispute is a prerequisite to whether Edmondson is entitled to the relief he seeks.[58] To be clear, my determination of stock ownership and voting power is made solely for purposes of resolving the director control dispute under Section 225. I am not adjudicating plenary claims relating to damages, rescission, or other forms of relief beyond that necessary to determine who has the present authority to remove directors.

## A. The April 2025 Issuance

Edmondson relies on a strict reading of 8 *Del. C.* § 152, which states that stock may issue only upon valid board authorization.[59] He asserts that because he never executed the April Consent, no board action occurred, and no stock was issued to Holdings.[60] As such, he insists that Holdings cannot remove him as the Company's sole director.

---

[57] *See supra* notes 42-43 and accompanying text; *see* PTO § IV ¶ 31.

[58] *See Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc*., 2017 WL 5956877, at *23 (Del. Ch. Nov. 30, 2017) (noting that Section 225 implicitly grants the court power to adjudicate beneficial ownership if necessary to determine the rightful directors, and that a judgment failing to resolve such a dispute would be meaningless).

[59] 8 *Del. C.* § 152.

[60] Pl.'s Pre-trial Br. 3; Pl.'s Post-trial Br. 2.

Because Edmondson never signed the April Consent, no board action authorized the issuance of Company stock to Holdings.[61] But it would be deeply inequitable to permit Edmondson to weaponize this defect of his own design. Delaware law does not exalt form over substance. Rather, corporate acts are "twice-tested"—once by law and again in equity.[62] As the Court of Chancery noted in *Kalageorgi v. Victor Kamkin, Inc.*, the formal requirements associated with stock issuances exist to evidence intent, not to defeat it.[63] The equitable doctrines of acquiescence and estoppel bar the relief Edmondson seeks.

1.     Acquiescence

Edmondson acquiesced to Holdings' ownership of the Company's 10 issued shares. Acquiescence occurs where a claimant:

> has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; *or* (2) freely does what amounts to recognition of the complained of act; *or* (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[64]

---

[61] *See* PTO § II ¶ 6.

[62] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 (Del. 2014) (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971)).

[63] 750 A.2d 531, 539 (Del. Ch. 1999) ("It is hardly frivolous . . . to argue that to invalidate [] stock for purely formalistic reasons would defeat not only the board's clear intent but also the purpose of the formal requirements themselves, which is to create indisputable evidence that the board intended to authorize the issuance of the securities."), *aff'd*, 748 A.2d 913 (Del. 2000).

[64] *Klaassen*, 106 A.3d at 1047; *see also Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (explaining that "[a]s the disjunctive framing indicates, a defendant need only establish one of the bases for acquiescence"), *aff'd*, 106 A.3d 1035

The defendants have proven both affirmative recognition and inconsistent acts by Edmondson that amount to acquiescence.

Edmondson knew he had withheld his signature from the April Consent. He told no one.[65] At the same time, he engaged in months of conduct that recognized the document's validity.[66]

The same April Consent that would have authorized the issuance of 10 shares to Holdings appointed Edmondson the Company's President, Secretary, and Treasurer.[67] Though Edmondson ignored the stock issuance portion of the consent, he embraced the corporate titles it granted him.[68] He used them to apply to transact business in Illinois and to effectuate a corporate name change.[69] He cannot claim the corporate offices granted by the April Consent while repudiating the

---

(Del. 2014); *In re Coinmint*, *LLC*, 261 A.3d 867, 895 (Del. Ch. 2021) ("[T]he doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights." (quoting *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014))).

[65] *See Nevins v. Bryan*, 885 A.2d 233, 247 (Del. Ch. 2005) (characterizing Nevins' "failure to object" as "significant" and finding the passage of time during which he failed to object injurious to defendants, who "relied on Nevins's apparent acquiescence to their" status as directors), *aff'd*, 884 A.2d 512 (Del. 2005).

[66] *See, e.g.*, *supra* notes 19-26, 28-29, 33-37 and accompanying text.

[67] April Consent 6-8.

[68] *See* Edmondson Tr. 27 (testifying that he believes he is the President, Secretary, and Treasurer of the Company).

[69] JX 105; JX 114.

capitalization structure set by the same document. By his affirmative conduct, he acquiesced to the issuance of shares to Holdings.[70]

### 2. Equitable Estoppel

Even if acquiescence did not independently bar Edmondson's request for relief, equitable estoppel compels the same result. The doctrine of equitable estoppel arises "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment."[71] The party invoking the doctrine must show:

> (i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance.[72]

All three elements are satisfied here.

---

[70] *See Frank v. Wilson & Co.*, 32 A.2d 277, 282 (Del. 1943) (affirming trial court's finding that a plaintiff "could not accept the benefit offered by the [recapitalization] plan and at the same time d[e]ny its validity" where plaintiff voted against the plan, but later accepted post-recap dividends for two years without objection, under doctrine of acquiescence); *see also Chai v. Maginn*, 2024 WL 4356303, at *12-13 (Del. Ch. Oct. 1, 2024) (granting summary judgment for the defendant in light of plaintiff's acquiescence to the defendant's status as director), *aff'd*, 341 A.3d 506 (Del. 2025) (TABLE).

[71] *Nevins*, 885 A.2d at 249 (holding that a founder was barred by principles of equitable estoppel, and other equitable doctrines, from challenging that directors elected at a special election were not directors (quoting *Wilson v. Am. Ins.*, 209 A.3d 902, 903-04 (Del. 1965))).

[72] *Id.* at 249 (citation omitted).

First, Holdings lacked knowledge that the consent was unexecuted because Edmondson covertly withheld his signature.[73] Perhaps Holdings could have demanded the executed signature page. But Edmondson lulled Holdings into a false sense of security by accepting his officer titles and holding the Company out as Holdings' subsidiary.[74]

These facts are similar to *Nevins v. Bryan*, where the plaintiff disputed the composition of a board because a written consent he initiated was never forwarded to the other directors for signature.[75] The court applied equitable estoppel, looking past the technical availability of the corporate records and focusing on the plaintiff's statements holding the defendants out as valid directors.[76] Edmondson likewise created the technical defect and hid it through months of deception.

Second, Holdings reasonably relied on Edmondson's conduct. Oakes had a longstanding relationship with Edmondson and "felt [he] could trust him."[77] Though Oakes' trust was misplaced, Edmondson gave him every reason to extend it. Indeed, Edmondson himself signed a Foreign Corporation Certificate in Illinois, under

---

[73] *See* April Consent; Edmondson Tr. 30-33.

[74] *See, e.g.*, *supra* notes 20-26, 28-29, 35-36 and accompanying text.

[75] *Nevins*, 885 A.2d at 238.

[76] *Id.* at 249.

[77] Oakes Tr. 98 (stating that he found it "inconceivable" that Edmondson "would betray that trust").

penalty of perjury, affirming that 10 shares of the Company's stock had been issued to Holdings.[78]

Third, Holdings' reliance on Edmondson's actions caused it to suffer a detriment. Holdings infused the Company with capital, including a $225,000 setup loan, transferred its goodwill by introducing the Company to its most valuable client (WMX), and provided comprehensive back-office support.[79] Holdings would not have bankrolled the U.S. operations or entrusted Edmondson with its clients had it known of Edmondson's deception.[80] It was only after Edmondson had accepted the benefits of the April Consent—utilizing his officer titles and Holdings' capital to build the business—that he effectively repudiated the corporate structure and issued himself and his associates most of the Company's authorized shares.[81]

---

[78] *See* JX 105; Edmondson Tr. 46; *see also* Edmondson Dep. 142. Edmondson argues that the Illinois certificate is irrelevant because it was made for "regulatory purposes," and is not an official corporate action issuing stock. Pl.'s Post-trial Br. 4. Nevertheless, the certificate is evidence of Edmondson's conduct in alignment with the April Consent. *Cf. Grant v. Mitchell*, 2001 WL 221509, at *4, *7-9 (Del. Ch. Feb. 23, 2001) (finding that an initial board was composed of the individuals listed in a Foreign Corporation Certificate signed by an incorporator/director when the initial consent appointing the directors was never executed).

[79] PTO § II ¶ 6; JX 185; Smith Dep. 24-26; Comerford Dep. 31, 33-35.

[80] *See* Edmondson Dep. 102-04, 128-29, 136, 138, 141; *see supra* notes 20-26.

[81] PTO § II ¶ 11; JX 110; *see Hannigan v. Italo Petroleum Corp. of Am.*, 47 A.2d 169, 172-73 (Del. 1945) (discussing the application of estoppel principles where one who has accepted the "fruits or benefits" of a transaction "will be estopped to deny the validity and binding effect unless the contract or transaction is in violation of some positive law or well settled rule of public policy" (citing 2 *Fletcher on Corporations* § 773 (perm. ed.))).

\*     \*     \*

Edmondson cannot manufacture corporate control by exploiting a technical defect of his own making. Equity does not reward such trickery.[82] Through his silence and willing acceptance of the Company's funding and officer titles, Edmondson acquiesced to Holdings' ownership. He is also equitably estopped from asserting otherwise. For purposes of this Section 225 proceeding, Holdings is recognized as the holder of the Company's initial 10 shares and is entitled to exercise the voting rights associated with those shares.

## B. The October 2025 Issuance

Edmondson next contends that Holdings cannot remove him from the board because the October Consent issued 150 shares to him and his associates.[83] The Company's certificate of incorporation authorized 200 shares.[84] Edmondson, as the sole director, had the legal authority to issue authorized shares under Section 152.[85]

---

[82] *Atlantis Plastics Corp. v. Sammons*, 1988 WL 32371, at \*3 (Del. Ch. Mar. 30, 1988) ("No man should profit from his own inequity or take advantage of his wrong." (quoting Cardozo, *The Nature of the Judicial Process*, at 41 (1921))).

[83] *See* Pl.'s Pre-trial Br. 3-4 (arguing that the only valid stock issuance under Section 152 occurred on October 7, 2025); *see* JX 110.

[84] JX 29.

[85] *See* 8 *Del. C.* § 152; *see also* JX 182 (Company bylaws at art. III, § 1) (stating that the board consists of one director); JX 27 (appointing Edmondson as the sole director).

Because the issuance was not *ultra vires* or in contravention of the Company's charter, it is not void.[86]

That does not mean Edmondson prevails, however. As the Delaware Supreme Court recently reiterated in *Moelis & Company v. West Palm Beach Firefighters' Pension Fund*, there is an "essential distinction between voidable and void acts."[87] Corporate acts that fall within the board's statutory power but are taken "in violation of equitable principles" are voidable.[88] The defendants argue that the October Consent falls into the latter category as a self-interested maneuver designed to entrench Edmondson.[89]

"Inequitable action does not become permissible simply because it is legally possible."[90] Thus, despite Edmondson's compliance with Section 152 and the charter, I must determine whether equity permits Edmondson to rely upon the

---

[86] *See Klaassen*, 106 A.3d at 1046 (explaining that acts within the power of a corporation but executed in breach of a director's fiduciary duties are voidable, not void).

[87] — A.3d —, 2026 WL 184868, at *6 (Del. Jan. 20, 2026) (quoting *Klaassen*, 106 A.3d at 1046).

[88] *Moelis*, 2026 WL 184868 at *6.

[89] Defs.' Pre-trial Br. 40-41 (arguing that "[w]here a board's actions are shown to have been taken for the purpose of entrenchment, they may not be permitted to stand" and that the issuance "[m]ust [b]e [s]et [a]side in [e]quity" (citation omitted)); Defs.' Post-trial Br. 6-7.

[90] *Schnell*, 285 A.2d at 439.

18

October Consent to defeat his removal.[91] Even a statutorily authorized stock issuance may be disregarded if undertaken for an inequitable purpose.[92]

*Coster v. UIP Companies* outlines the governing framework.[93] Although self-dealing transactions can implicate entire fairness review,[94] where a stock issuance interferes with the stockholder franchise, enhanced scrutiny applies. Even if a transaction could satisfy entire fairness, it must still withstand enhanced scrutiny where it operates to constrain the stockholder franchise.[95]

Edmondson—the Company's sole director—issued shares to himself and his affiliates to interfere with his removal from the board. In doing so, he blocked Holdings from exercising its voting power. The October issuance therefore must

---

[91] *See CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 400 n.64 (Del. 2023) (explaining in a Section 225 case that director action is "'twice-tested,' first for legal authorization, and second by equity" (quoting *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017)).

[92] *See Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 96 (Del. 2021) (invalidating board actions under equitable principles, despite technical compliance with corporate governance documents, where directors used deception to manufacture a quorum and seize control).

[93] 300 A.3d 656 (Del. 2023).

[94] *See Keyser v. Curtis*, 2012 WL 3115453, at *13 (Del. Ch. July 31, 2012) (holding that where a sole director issued corporate stock to himself to gain control and prevent his removal, the transaction was subject to entire fairness review), *aff'd sub nom.*, *Poliak v. Keyser*, 65 A.3d 617 (Del. 2013).

[95] *See Coster*, 300 A.3d at 672 (explaining that "the court's review is situationally specific and is independent of other standards of review"); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *19 (Del. Ch. May 31, 2022) (explaining that equitable review is not foreclosed in a Section 225 case), *aff'd*, 302 A.3d 387 (Del. 2023).

19

satisfy enhanced scrutiny.[96] Edmondson must show that (1) "the board faced a threat 'to an important corporate interest or to the achievement of a significant corporate benefit,'" and (2) his "response to the threat was reasonable in relation to the threat posed and was not preclusive or coercive to the stockholder franchise."[97] He cannot do so.

First, Edmondson has not identified a legitimate threat to corporate policy or effectiveness. By his own admission, he issued the stock as a "safeguard" to "prevent anybody from taking Teliporter (US) Inc. away" by manufacturing leverage for his demands to be compensated for "sweat equity" in Holdings.[98] Securing personal leverage is not a corporate interest. Nor is Holdings' potential

---

[96] *Coster*, 300 A.3d at 667, 672-73; *see also Johnston v. Pedersen*, 28 A.3d 1079, 1089-90 (Del. Ch. 2011) (applying enhanced scrutiny in a Section 225 action regarding a contested director election).

[97] *Coster*, 300 A.3d at 672 (quoting *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *7 (Del. Ch. Aug. 27, 1987)).

[98] Edmondson Dep. 172-73 ("Q: Why did you issue the stock? A: It was a safeguard to just prevent anybody from taking Teliporter (US) Inc. away. So that we could have a discussion about ownership, and so that we could safeguard the sweat equity . . . . Q: Ensure your control of Teliporter (US)? A: Correct. Q: Because you were not issued what you perceived to be your rightful equity in Teliporter Holdings? A: Correct."); *id.* at 171 ("Q: If you had gotten an equity interest in Teliporter Holdings, from your perspective, we wouldn't be here today, correct? A: Correct."); *see* Edmondson Tr. 51-52.

exercise of its removal rights a cognizable threat to the Company that could justify a defensive stock issuance.[99]

Second, even if a true threat existed (it did not), Edmondson's response was disproportionate. The October Consent altered the Company's capital structure to eliminate Holdings' ability to remove Edmondson. A defensive action is preclusive—and unreasonable—if it renders a successful stockholder vote mathematically unattainable.[100]

Because the October issuance was within the board's statutory authority but fails enhanced scrutiny, it is voidable in equity. For purposes of this Section 225 proceeding, the 150 shares purportedly issued by the October Consent are disregarded in determining voting control.[101]

---

[99] *See Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1124 (Del. Ch. 1990) ("[T]he prospect of losing a validly conducted shareholder vote cannot, in my opinion, constitute a legitimate threat to a corporate interest.").

[100] *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1388-89 (Del. 1995) (holding that a defensive measure is preclusive, and therefore unreasonable, if it makes an insurgent's victory mathematically impossible or realistically unattainable); *see also Pell v. Kill*, 135 A.3d 764, 788 (Del. Ch. 2016) (enjoining a board reduction plan as preclusive because it mathematically eliminated the stockholders' ability to establish a new board majority).

[101] I do not adjudicate the ultimate validity of those shares in this Section 225 suit. Given that Edmondson's current status as a director is undisputed, I also do not address whether the November 21 written consent is valid. *See* JXs 136-37; Defs.' Post-trial Br. 6 (confirming the defendants are not presently "contend[ing] that Plaintiff has been removed as director" through the November consent).

21

## C.    Unclean Hands

Finally, even if Edmondson could survive equitable scrutiny, his claims are barred by the doctrine of unclean hands.[102]  The doctrine "is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case."[103]  "[T]he inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought."[104]

Edmondson initiated this Section 225 suit to secure judicial recognition of his control over the Company.  But that control was manufactured through deception. He withheld his signature from the April Consent, concealed that omission, and now relies on it to assert exclusive authority—all to create leverage in a dispute over personal interests in Holdings.[105]  Equity will not grant relief premised on such conduct.

---

[102] *See* Defs.' Pre-trial Br. 46-49 (arguing that unclean hands bars Edmondson from obtaining relief); *Brown v. Kellar*, 2018 WL 6721263, at *6 (Del. Ch. Dec. 21, 2018) (addressing equitable defenses in a Section 225 case, and observing that "Delaware courts reject the notion that 'rigid, inflexible rules preclude this court from hearing anything but the narrowest arguments in Section 225 cases'" (citation omitted)).

[103] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).

[104] *Id.* (citation omitted).

[105] Edmondson Tr. 52; *see supra* note 98; *cf. Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *14 (Del. Ch. June 23, 2021) (noting that when a party perceives a breach of their rights, they must seek redress through the proper channels rather than invoking extra-contractual "self-help").

## III.   CONCLUSION

For the above reasons, judgment is for the defendants.  For purposes of this Section 225 proceeding, Holdings is entitled to exercise the voting rights associated with 10 shares of the Company's stock.  The 150 shares purportedly issued to Edmondson, Tauzin, and Timmons in the October Consent are voidable and disregarded for purposes of determining voting control.  Holdings therefore has the present authority to act by written consent to remove Edmondson as a director.

The parties must confer and submit a proposed form of final judgment implementing these rulings within one business day.  If no consensus is reached, they must file competing proposed orders within that same timeframe.